**Howard WILLIAMS and Sharon Williams, Appellants–Plaintiffs,**

**v.**

**R.H. MARLIN, INC., Pitt–Des Moines, Inc., Michael Hutchinson, and Real Mechanical, Inc., Appellees–Defendants.**

No. 49A02–9501–CV–5.

Court of Appeals of Indiana.

Oct. 17, 1995.

Richard J. Dick, Mitchell Hurst Jacobs & Dick, Indianapolis, for appellants.

Kenneth P. Reese, William O. Harrington, Lewis & Wagner, Kent O. Stewart, Charles F. Miller, Jr., Stewart Due Miller & Pugh, Stephen L. Bola, Regina M. Poore, Hill Fulwider McDowell Funk & Matthews, Indianapolis, Steven H. Henke, Elizabeth I. Van Tassel, Coots, Henke & Wheeler, Carmel, for appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Plaintiffs–Appellants Howard Williams and Sharon Williams (hereinafter referred to as "Williams" individually) appeal from the denial of their motions for partial summary judgment and the granting of the individual summary judgment motions of Defendants–Appellees R.H. Marlin, Inc. (Marlin); Pitt–Des Moines, Inc. (PDM); Michael Hutchison (Hutchison); and Real Mechanical, Inc. (Real).

We reverse and remand with instructions.

### ISSUES

We consolidate the numerous issues raised by the parties, and address the following two dispositive issues:

1. Whether the trial court erred when it found that the exclusivity provision of the Indiana Worker's Compensation Act barred Williams's claims against the defendants.

2. Whether the trial court erred when it granted the summary judgment motions of Hutchison, PDM, Marlin and Real.

### FACTS AND PROCEDURAL HISTORY

This case involves a claim for personal injuries sustained by Howard Williams when a caged basket in which he was being lifted by a crane dropped several feet to the ground. At the time of Williams's injuries, he was employed by Irex–Centin Corporation (Centin) as an insulator and was performing work at a facility owned by Citizens Gas & Coke. Centin was a subcontractor on the project, hired by Real to perform the insulation portion of the project. Real was a subcontractor hired by PDM, the general contractor on the project. No direct contract existed between Centin and PDM; however, the contract between PDM and Real included an agreement by Real to perform the insulation portion of the job.

PDM agreed to make available to Real a crane, crane operator and oiler for the performance of Real's work. In furtherance of this arrangement, PDM entered into an agreement with Marlin for the rental of a crane, crane operator and oiler. The crane was intended to be used to perform various tasks of lowering and lifting building materials and workers. It was also expected that the crane would be used by the employees of Real and its subcontractor, Centin. Hutchison was employed by Marlin, and was oper-

ating the crane the morning that Williams was injured.

On the morning of May 16, 1991, several Centin employees, including Williams, were in the crane basket to be lifted to the platform on which they were performing insulation work that day. As the crane approached the platform, it suddenly dropped several feet. While the basket was falling, Williams sustained injuries.

Williams filed a negligence suit against the defendants Hutchison, Marlin, PDM and Real.[1] Williams subsequently filed two motions for partial summary judgment—one on the issue of borrowed servant/employer-employee relationship and one on the issue of whether his suit was barred by the exclusivity provision of the Act. Each of the four defendants filed separate motions for summary judgment based primarily on the argument that Hutchison was the borrowed servant of Williams's employer Centin, and therefore Williams's suit was barred by the exclusivity provision of the Act.

Following hearings on the motions, and taking the issues under advisement, the trial court denied Williams's motions for partial summary judgment and granted each of the defendants' motions for summary judgment. Specifically, the trial court found that Hutchison was not only the employee of Marlin, but was also the "borrowed servant" of Centin, making Hutchison and Williams co-employees thereby relegating Williams to exclusive remedies under the Indiana Worker's Compensation Act (hereinafter "the Act"). IND. CODE 22-3-1-2 et seq. Williams appeals.

*DISCUSSION AND DECISION*

I. Subject Matter Jurisdiction

A. Standard of Review

This case involves two basic issues which were confused and merged by the parties' election to file motions for summary judgment, rather than by challenging the trial court's exercise of jurisdiction. The threshold issue as we see it is whether Williams's sole remedy lies within the Act and whether the trial court had subject matter jurisdiction

to adjudicate his common law claims. The second set of issues which will determine liability are: (1) who was Hutchison's general employer; (2) who was Hutchison's special employer under the borrowed servant doctrine; and (3) who is liable for Hutchison's negligence. In order to properly resolve the issues raised, we will first resolve the jurisdictional question and second, we will resolve the liability issue using the summary judgment standard.

Each of the defendants herein moved for summary judgment arguing essentially that Williams's tort claims were barred by the exclusive remedy provision of the Act, I.C. 22-3-2-6 (1994). However, our supreme court has recently held in a series of decisions that the use of a summary judgment motion is inappropriate where the Act's exclusivity provision is raised as a bar to plaintiff's complaint. *Perry v. Stitzer Buick GMC, Inc.* (1994), Ind., 637 N.E.2d 1282, 1286, *reh'g denied; Foshee v. Shoney's, Inc.* (1994), Ind., 637 N.E.2d 1277, 1280; *See also Northcutt v. Smith* (1994), Ind.App., 642 N.E.2d 254, 255. Such a defense is an attack on the trial court's subject matter jurisdiction and cannot be raised by a motion for summary judgment. *Perry,* 637 N.E.2d at 1286; *Foshee,* 637 N.E.2d at 1280. Rather, the proper vehicle in which to raise the defense is a motion to dismiss for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1). *Id.* A civil court lacks subject matter jurisdiction where a claimant's action falls within the Act's exclusivity provision. *Weldy v. Kline* (1993), Ind.App., 616 N.E.2d 398, 401 (citing *Wolf Corp. v. Thompson* (1993), Ind.App., 609 N.E.2d 1170, 1171).

Based on these recent decisions, the trial court should have treated this issue under the standard of review for motions to dismiss for lack of subject matter jurisdiction. *Perry,* 637 N.E.2d at 1287.

Therefore, we will review this issue as a jurisdictional question upon which the plaintiff carries the burden of proof. *See Foshee,* 637 N.E.2d at 1281. For the trial

---

1. Real was initially brought into the action by PDM via a third-party complaint based on a breach of contract theory regarding the insurance status of PDM on Real's insurance policy.

When the borrowed servant issue was raised, Williams amended his complaint to add Real as a named defendant.

court to exercise jurisdiction over the negligence claim, the claim must fall outside of the exclusivity provision of the Act. Therefore, if we conclude that Williams's exclusive remedy is to pursue a claim for benefits before the Worker's Compensation Board, we must remand the cause to the trial court with instructions to dismiss for lack of subject matter jurisdiction. *See Foshee,* 637 N.E.2d at 1281; *see also Northcutt,* 642 N.E.2d at 258. However, if our review of the record satisfies us that Williams established jurisdiction in the trial court, we will review the substantive liability issue raised in the parties' respective summary judgment motions.

### B. The Exclusivity Provision of the Act I.C. 22–3–2–6

■ We first address whether Williams established jurisdiction in the trial court, and whether his claims are barred by the exclusive remedy provision of the Act. We decide as a matter of law that Centin was not the special employer of Hutchison at the time of the Act. Therefore, Williams and Hutchison are not co-employees and Williams's claims are not barred by the exclusivity provision of the Act.

Williams contends that the trial court erred when it found that his claim against Hutchison was barred by the exclusivity provision of the Act. Specifically, Williams argues that the Act does not bar his action against Hutchison because Centin was not the employer of Hutchison within the meaning of the Act, and therefore the fellow-employee immunity provision of the Act is inapplicable.

■ The dispositive issue then is whether the requisite employer-employee relationship existed between Centin and Hutchison to bring the parties within the protections of the Act. Logically, one must fall within the protections of the Act in order to claim immunities under the Act. Essentially, Hutchison is attempting to claim immunities under the Act without establishing that he was in fact an employee of Centin.

The Act's exclusive remedy provision provides that

[t]he rights and remedies granted to an employee subject to IC 22–3–2 through IC 22–3–6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, the employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 5–2–6.1.

I.C. 22–3–2–6. This section limits an employee whose injury meets the jurisdictional requirements of the Act to the rights and remedies provided by the Act. Thus, if an employee's injury occurred by accident and arose out of and in the course of employment, he is entitled to worker's compensation and I.C. 22–3–2–6 operates to bar a court from hearing any common law action brought by the employee for the same injuries. *Evans v. Yankeetown Dock Corp.* (1986), Ind., 491 N.E.2d 969. However, the Act permits actions against third party tortfeasors, so long as the third party is neither the plaintiff's employer nor his fellow employee. I.C. 22–3–2–13 (1988) provides as follows:

Whenever an injury or death, for which compensation is payable under chapters 2 through 6 of this article shall have been sustained under circumstances creating *in some other person than the employer and not in the same employ* a legal liability to pay damages in respect thereto, the injured employee, or his dependents, in case of death, may commence legal proceedings against the other person to recover damages notwithstanding the employer's or the employer's compensation insurance carrier's payment of or liability to pay compensation under chapters 2 through 6 of this article. (emphasis provided).

The language "in the same employ" specifically preserves a co-employee's immunity from common law liability for accidents found to have arisen out of and in the course of employment. *Northcutt,* 642 N.E.2d at 256. Therefore, the fact that Williams may be entitled to worker's compensation benefits from his general employer Centin does not bar him from pursuing third party actions against those responsible for his injuries.

Hutchison seeks immunity under the fellow servant immunity provision of the Act; however, he frames all of his arguments

within the common law doctrine of borrowed servant. Recent cases decided under the Act do not rely on the common law borrowed servant line of cases, but rather employ the *Hale* seven-part test. *See Hale v. Kemp* (1991), Ind., 579 N.E.2d 63, 67, n. 2; *Riffle v. Knecht Excavating, Inc.* (1995), Ind.App., 647 N.E.2d 334, 337, n. 1, *trans. denied.*

We must determine whether an employer-employee relationship existed between Centin and Hutchison, because if such a relationship existed, then Hutchison was a fellow employee of Williams at the time he operated the crane, and Williams is barred from suing Hutchison.

The Act defines "employer" and "employee" as follows:

"Employer" includes the state and any political subdivision, any municipal corporation within the state, any individual, firm, association, limited liability company, or corporation or the receiver or trustee of the same, or the legal representatives of a deceased person, using the services of another for pay....

"Employee" means every person, including a minor, in the service of another, under any contract of hire or apprenticeship, written or implied, except one whose employment is both casual and not in the usual course of the trade, business, occupation, or profession of the employer.

I.C. 22–3–6–1(a)(b) (1994).

We addressed this very issue in the recently decided case of *Riffle v. Knecht Excavating,* 647 N.E.2d 334. In that case, Riffle was injured while working on a construction site for his employer, McMahon–O'Connor ("M–O"). In order to fulfill certain obligations of its contract, M–O rented a track-driven backhoe and an operator, Rittenhouse, from Star Excavating ("Star"). Riffle was injured when a large chunk of earth dislodged from a wall of a trench he was working in. Rittenhouse had dug the trench pursuant to the M–O job superintendent's instructions. The trial court granted summary judgment to both Rittenhouse and Star. *Riffle,* 647 N.E.2d at 336. On appeal, Riffle argued that Rittenhouse was not a borrowed servant of M–O, and therefore he was not barred from suing Rittenhouse and Star by the exclusivity provision of the Act. *Id.*

In deciding whether an employer-employee relationship existed between M–O and Rittenhouse, we employed the seven-part test used by our supreme court in *Hale,* 579 N.E.2d 63.

To determine if an employer-employee relationship exists which may subject an employee to the Worker's Compensation Act so as to bar his common law claims against the special employer to whom he was 'loaned', the following factors have been enumerated: (1) the right to discharge; (2) the mode of payment; (3) supplying tools or equipment; (4) belief of the parties in the existence of an employer-employee relationship; (5) control over the means used in the results reached; (6) length of employment; and (7) establishment of the work boundaries.

*Hale,* 579 N.E.2d at 67 (citing *Fox v. Contract Beverage Packers, Inc.* (1980), Ind.App., 398 N.E.2d 709).

Hutchison urges us to employ the so called "Refined Framework" test discussed in *Hollars v. City of Muncie* (1993), Ind.App., 625 N.E.2d 469. Specifically, we said in *Hollars* that "[t]he test for determining the existence of an employer-employee relationship is the right of the employer to direct and control the conduct of the employee at the time the negligent act occurred." *Id.* at 471. Thus, Hutchison contends that the issue should hinge on who was the master at the very moment of the negligent act. However, in *Hollars,* we cited to *Gibbs v. Miller* (1972), 152 Ind.App. 326, 283 N.E.2d 592, 594, which decides this question using the seven-part *Hale* test.

We find the seven-part *Gibbs/Hale* test to be the correct test to use, and will employ it to determine whether an employer-employee relationship existed between Centin and Hutchison. *See Riffle,* 647 N.E.2d at 337, n. 1; *Hale,* 579 N.E.2d at 67, n. 2.

Review of the voluminous discovery material reveals that an employer-employee relationship between Centin and Hutchison did not exist within the meaning of the Act. The following facts pertinent to the *Hale* seven-part test preclude us from finding that Williams and Hutchison were co-employees.

**(1) The Right to Discharge:**

Jerry Sniadecki, the Centin superintendent at the site, testified by affidavit that neither Centin nor its employees had the authority to fire Hutchison. Hutchison testified in his deposition that he thought PDM had the right to terminate him if he failed to perform according to its specifications. Charlie Barrett, Quality Control Manager for PDM, testified by deposition that if Hutchison failed to perform, PDM would have him removed from the site, and had the authority to do so. However, Barrett said, if Centin was unsatisfied with Hutchison's performance, it would not have the authority to discharge Hutchison, but rather would have to come to PDM.

**(2) The Mode of Payment:**

Sniadecki testified that Centin had no control over where the crane would be located, which company would be hired to operate the crane, or how the crane operator and oiler would be compensated. Hutchison testified that the PDM superintendent signed his hour tickets every week in order for Marlin to pay him. Hutchison received his pay check directly from Marlin. Barrett of PDM testified that Hutchison's hours worked were invoiced directly to PDM by Marlin, and then Marlin was reimbursed by PDM for Hutchison's hours. PDM did not make any direct payments to Hutchison; however, PDM paid Marlin directly for the services, then Marlin paid Hutchison. PDM's answers to Real's first set of interrogatories confirm that PDM did not pay Hutchison directly, but that it reimbursed Marlin for paying him.

**(3) Supplying Tools or Equipment:**

Sniadecki testified that Centin did not provide any tools or equipment to Hutchison. Furthermore, Centin is in the business of providing insulation materials and installing insulation materials, not in the business of leasing or operating cranes. Hutchison testified that he provided his own tools while working on the site. Barrett of PDM testified that he talked with the crane operator once a day to make sure there were no problems, and to supply any needed equipment, such as diesel fuel or grease.

**(4) Belief of the Parties:**

Hutchison testified that he believed that he was under the control of PDM and the assigned Marlin crane operator, Guy Ellis. Hutchison was dispatched by Marlin to the PDM site to operate as an oiler. Hutchison was told by PDM that it was furnishing the crane for the use of the contractors and that PDM instructed him that he was to lift up whoever wanted to go so long as PDM was not using the crane at the time. Additionally, Hutchison thought that PDM had the right to discharge him. Hutchison did not really know who the workers being lifted were, although he assumed that they were subcontractors of PDM. He was clearly under the impression that he and the crane were under the direction and control of PDM. Once Marlin dispatched him to the site, he was given no further instruction by Marlin, except for the on-site supervision of Guy Ellis. Hutchison did not even recognize the name "Centin" and assumed that PDM was the only contractor that he needed to be concerned with since PDM signed his work tickets. Hutchison stated several times in his deposition that he thought that he was under the supervision of PDM, and that he was working directly for PDM.

**(5) Control:**

Sniadecki testified that neither he nor any other Centin employee determined the logistics concerning Hutchison's employment. Centin had no control as to where the crane would be located at any given time, which company would be hired to operate the crane, or how the crane operators would be compensated. Sniadecki had never spoken to Hutchison prior to the accident. The crane was only used to lift Centin employees when it was not being used by PDM or other contractors. In fact, Centin employees were only permitted to be lifted with the crane if PDM was not using it. Centin employees did not have the power to insist that Hutchison lift them if Hutchison refused. Centin employees were only occasionally lifted by the crane, and only when the crane was not being used by other contractors. Furthermore, the crane rental agreement indicates clearly that PDM was the intended lessee,

and provided that the crane "[o]perator shall be under the full directions and control of the Lessee (PDM) and the Lessee shall hold the Lessor (Marlin) harmless for any liabilities which may arise as a result of the operator's conduct or performance." (R. 579). Hutchison testified that he did not even know who Williams was or who he worked for. Just prior to the accident, Hutchison offered to relinquish control of the crane to Ellis since Ellis was the designated crane operator; however, Ellis told him to continue. Barrett of PDM testified that PDM controlled the scheduling, and Hutchison needed to have PDM's permission in order to leave the job site. PDM made the initial location placement decision with regard to the crane. Barrett confirmed that Centin had no input as to how the crane would be used. Williams testified that he had never received any instruction from Centin regarding Centin's use of the crane or his use of the crane. Williams assumed that Centin was allowed to use the crane to complete its work as needed. PDM indicated in its answers to Real's first set of interrogatories that Marlin's crane operator knew that he would be working under the supervision and direction of the various contractors and subcontractors on the site. PDM maintained that it provided directions to the crane operator only when the crane was being used by PDM.

**(6) Length of Employment:**

Hutchison had been on the site only a few weeks when the accident occurred.

**(7) Work Boundaries:**

*See supra* (5) Control.

In sum, Centin did not agree to make payment, either directly or indirectly, for Hutchison's services or for the use of the crane, did not control any aspect of Hutchison's work or the manner in which he performed his job, and had no authority to terminate him. Hutchison believed that he was working under the supervision of PDM, and PDM concedes that it had the authority to remove Hutchison from the site if it became necessary to do so. Furthermore, the lease agreement between Marlin and PDM clearly states that the operator was under the full control of PDM.

The only facts which support the proposition that Centin was Hutchison's employer are that Centin did occasionally use the crane to complete its work, and that on the date of the injuries Centin employees motioned to Hutchison to lift them up. Workmen signaling to a crane operator with a "thumbs-up" hardly constitutes an assertion of control.

We conclude that the majority, if not all, of the indicia used to determine the existence of an employer-employee relationship are absent in this case. Therefore, having failed to establish the existence of the requisite employer-employee relationship, Hutchison is not entitled to immunity under the Act's fellow-employee exemption and Williams is not relegated to the Act for his sole remedy. We are satisfied that Williams has established jurisdiction in the trial court, and therefore we will decide the issues raised in the parties' respective motions for summary judgment.

II. *Respondeat Superior* Liability

Having decided that Williams is entitled to pursue negligence claims against the defendants, we next decide the borrowed servant/vicarious liability issue raised by the defendants. Because we find that genuine issues of material fact exist as to the employment relationships between the parties and because the undisputed facts lead to conflicting inferences on this issue, summary judgment for the defendants is not the appropriate disposition of this case. There are genuine issues of material fact as to whether Marlin and/or PDM were Hutchison's employer at the time of accident and therefore liable for his negligence under the doctrine of *respondeat superior.* We further conclude as a matter of law that Real assumed a nondelegable duty regarding safety on the construction site, and there are genuine issues of material fact on the elements of breach of that duty and proximate cause.

A. Summary Judgment Standard

 Summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). We face the same issues that were before the trial court and

follow the same standard, giving no deference to the lower court's judgment. *Perryman v. Huber, Hunt & Nichols, Inc.* (1994), Ind.App., 628 N.E.2d 1240, 1243. We consider only the materials specifically designated to the trial court and resolve all doubts in favor of the nonmoving party. *Id.* When reviewing cross motions for summary judgment, the inquiry remains the same: Whether a genuine issue of material fact exists which requires resolution by the trier of fact. *American Family Mut. Ins. Co. v. Dye* (1994), Ind.App., 634 N.E.2d 844, 846, *reh'g denied, trans. denied.* Summary judgment is generally inappropriate in negligence actions. *Duffy v. Ben Dee, Inc.* (1995), Ind. App., 651 N.E.2d 320, 322.

### B. The Borrowed Servant Doctrine

PDM contends that the trial court correctly concluded that Hutchison was the borrowed servant of Centin, and therefore that Williams's exclusive remedy lies within the Act. We disagree for the reasons previously stated. Borrowed servant doctrine provides that "an employee while generally employed by one party, may be loaned to another in such a manner that the special employer may be responsible for the acts of the employee under the doctrine of *respondeat superior*." *Progressive Const. and Engineering Co., v. Ind. & Mich. Elec. Co.*, (1989), Ind.App., 533 N.E.2d 1279, 1285 (citing *New York Cent. R.R. Co. v. NIPSCO* (1966), 140 Ind.App. 79, 84, 221 N.E.2d 442, 446). Under the doctrine of *respondeat superior*, a master is liable for the physical torts of his servant if the servant commits the act while acting within the scope of his employment. Generally, the question of which employer is liable for the servant's negligence is a question for the trier of fact. *Progressive Constr.*, 533 N.E.2d at 1284.

The facts establish that Ellis was the dispatched crane operator for the particular type of crane being used to lift Williams at the time of his injury. Furthermore, the designated material reveals that Hutchison was dispatched to work as an oiler. At the time of Williams's injuries, Hutchison was operating the crane.

PDM argues that the fact that Centin was the only contractor doing hands-on work left at the site, and a Centin employee asked the crane operator to be lifted by giving a hand signal is tantamount to "direction and control", thereby making Hutchison a "borrowed servant" of Centin. We decline to find that this limited exercise of "control" by Centin employees, given Centin's minimal involvement with the crane and/or the crane operator, amounts to the formation of a master-servant relationship.

The undisputed facts establish that Williams's injuries were caused by the negligence of Hutchison. Therefore, liability lies with Hutchison or the parties responsible for his actions by virtue of the doctrine of *respondeat superior*. Control over Hutchison rests either with PDM and/or Marlin, but not with Centin. There are genuine issues of material fact as to whether Hutchison was the borrowed servant of PDM and if so, whether he was acting within the scope of his employment at the time of the accident. There are also genuine issues of material fact as to whether Marlin is vicariously liable to Williams under principles of *respondeat superior*.

The undisputed facts establish the following: the crane was leased by Marlin to PDM, with an operator and an oiler; at the time of the injury, Hutchison was operating the crane and Ellis was standing by; Marlin paid Hutchison directly for his work and PDM reimbursed Marlin; as Hutchison's general employer, Marlin had the right to discharge him. These facts raise a material factual issue regarding Marlin's control over Hutchison. There is also a factual issue as to whether Marlin, as Ellis's employer, retained sufficient control over Hutchison to make it jointly liable with PDM.

With regard to the defendant Real, Williams does not premise his argument on a *respondeat superior* theory of liability. Rather, he argues that Real could be liable for Hutchison's negligence based on an alleged breach of a contractual duty to provide a safe work site. Williams argues that Real assumed a duty of protection and safety for Centin's employees via Real's contract with PDM. Williams contends that the trial court erred in granting summary judgment in favor of Real because there is a genuine issue of material fact as to whether Real assumed

a contractual duty to observe and enforce PDM's safety program and whether it breached those duties.

■ To premise a recovery on a theory of negligence, a plaintiff must establish three elements: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff; (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff proximately caused by the breach. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, 995, *reh'g denied* (citing *Miller v. Griesel* (1974), 261 Ind. 604, 611, 308 N.E.2d 701, 706). Whether there is a legal duty from one party to another in a negligence action is a pure question of law. *Duffy,* 651 N.E.2d at 322. We must consider three things in determining whether a duty exists: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Webb,* 575 N.E.2d at 995. Specifically, imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm. *Id.* at 997.

■ Williams argues that Real assumed a duty of safety for him by virtue of certain provisions in Real's contract with PDM. Those provisions are as follows:

ARTICLE XV. *Lower Tier Subcontractor*

Subcontractor and each of its subcontractors and materialmen will observe and conform to the COMPANY [PDM] safety program and ... enforce an adequate safety program applicable to its own operations covered by this Subcontract.

. . . . .

ARTICLE XXII. *Safety*

Subcontractor shall protect the property of Owner and of adjacent property. All necessary precautions for the safety of employees of Owner, COMPANY [PDM], Subcontractor and any other contractor, *and others* on the site shall be taken. Federal, state and local safety laws, rules, regulations, and all building and other applicable codes must be adhered to. All safety instructions of owner and of COM-

PANY must be adhered to. (Emphasis provided).

(R. 933, 935). Williams argues that he qualifies as "others on the site." Generally, one cannot be held liable for the negligent acts of another, unless a master-servant relationship exists. *Perryman,* 628 N.E.2d at 1245, n. 10 (citing *Allison v. Huber, Hunt & Nichols, Inc.* (1977), 173 Ind.App. 41, 362 N.E.2d 193, 195). However, a duty of care may arise contractually. *Plan–Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212, 1218. In determining whether a duty exists, we will give effect to the intent of the parties as reflected by the contract language. If a contract affirmatively evinces an intent to assume a duty of care, actionable negligence may be predicated upon the contractual duty. *Plan–Tec,* 443 N.E.2d at 1218.

A plain reading of the contract language indicates that Real intended to assume a duty of care for the employees of the Gas Company, PDM, Centin, Williams, and any others on the site. There are material issues of fact regarding whether Williams's act of riding in the crane basket was a safety violation and whether this was the proximate cause of Williams's injuries, and therefore Real is not entitled to summary judgment.

■ In sum, our review of the designated materials reveals facts which point toward the proposition that either PDM or Marlin, individually or jointly, exercised control over Hutchison at the time of the accident. Because of the facts and the conflicting inferences drawn therefrom, we conclude that the trier of fact should be given the opportunity to determine the relationship between the parties and whether Hutchison was acting as the employee of PDM or Marlin or PDM and Marlin jointly. When the undisputed facts lead to conflicting inferences, summary judgment is not an appropriate disposition. *Dague v. Fort Wayne Newspapers, Inc.* (1995), Ind.App., 647 N.E.2d 1138, 1143. We further find that although Real is not susceptible to liability based on a *respondeat superior* theory, it did assume a contractual duty of safety toward Williams.

*CONCLUSION*

We determine as a matter of law that Centin was not the employer of Hutchison, and Hutchison was not acting as the borrowed servant of Centin at the time of the accident. Therefore, Williams and Hutchison are not co-employees and Williams's claims are not barred by the exclusivity provision of the Act. We further determine that there are genuine issues of material fact as to whether Marlin and/or PDM were Hutchison's employer at the time of the accident and therefore liable for his conduct. There are also genuine issues of material fact regarding Real's breach of its contractually assumed duty to Williams and the proximate cause of Williams' injuries.

We reverse the trial court's denial of Williams's motions for partial summary judgment and reverse the trial court's grant of summary judgment in favor of the defendants Hutchison, PDM, Marlin and Real.

Accordingly, we reverse and remand to the trial court for further proceedings not inconsistent with this opinion.

DARDEN, J., concurs.

CHEZEM, J., concurs in result.