Frank NOWICKI, Appellant–Plaintiff,

v.

CANNON STEEL ERECTION COMPANY, Appellee–Defendant.

No. 45A03–9803–CV–121.

Court of Appeals of Indiana.

May 17, 1999.

---

Mark Van Der Molen, Merrillville, Indiana, for appellant.

Thomas A. Carton, Bullaro, Carton & Stone, Munster, Indiana, for appellee.

## OPINION

MATTINGLY, Judge

Frank Nowicki filed suit against Cannon Steel Erection Company, claiming he received personal injuries and damages as a result of a Cannon employee's[1] negligent operation of a crane. The trial court dismissed Nowicki's complaint for lack of subject matter jurisdiction. Nowicki raises a single issue which we restate as whether, for purposes of determining jurisdiction under the Worker's Compensation Act, the trial court properly determined that Nowicki and the crane operator were co-employees.

We affirm.

---

1. Neither party argues on appeal that the crane operator was an independent contractor or that he was not a Cannon employee. At the hearing on Cannon's motion to dismiss, both parties' counsel characterized the crane operator as a Cannon employee. *See, e.g.,* R. at 461, 464, 477.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the trial court's judgment are that Nowicki was employed as a carpenter by Custom Woodcrafters (Custom), a construction company which builds frames for houses and townhomes. At the time of Nowicki's accident, Custom was working on a project which required the hiring of a crane service to lift roof trusses onto the townhomes. On August 4, 1993, Custom called Cannon to request a crane and a crane operator for the project. A Cannon secretary assigned James Battreall to report to the project the following day. Battreall did not have any further discussion with anyone from Cannon before he reported to the Custom project on August 5, 1993.

On the day of the accident, Nowicki and four Custom employees were installing roof trusses on some of the townhomes under construction. The Custom carpenters hooked the crane cable around the truss, then advised Battreall when he could start lifting the truss. Battreall's view of the spot where the truss was to be placed was blocked by a wall, so a Custom employee signaled Battreall so that Battreall could place the truss in the proper location on the building. Battreall moved the truss to within about a foot from the top of the wall. Nowicki and another Custom carpenter were preparing to nail it down when the truss was raised unexpectedly.[2] Nowicki was holding the end of the truss and its movement caused him to fall off the wall. Additional facts will be provided as necessary.

## STANDARD OF REVIEW

■ When determining whether an on-the-job injury claim should be dismissed for lack of subject matter jurisdiction, the trial court may consider the pleadings, affidavits, and any other evidence submitted. In addition, the court may weigh the evidence to determine the existence of the requisite jurisdictional facts and resolve factual disputes. *Davis v. Central Rent–A–Crane, Inc.,* 663 N.E.2d 1177, 1179 (Ind.Ct.App.1996). Where, as here, the trial court considers evidence in addition to the allegations in the

pleadings, we review the trial court's resolution of factual disputes by determining whether its findings are clearly erroneous; that is, we consider the evidence most favorable to the judgment along with the reasonable inferences to be drawn therefrom. *Lawson v. Raney Mfg., Inc.,* 678 N.E.2d 122, 126 (Ind.Ct.App.1997), *reh'g denied, trans. denied.* We will not reweigh the evidence nor judge the credibility of witnesses. *Id.* A finding is clearly erroneous when the record lacks any facts or reasonable inferences to support it. *Id.*

■ Normally, the burden falls upon the party opposing jurisdiction to prove that the court does not have jurisdiction. However, public policy favors the inclusion of employees within the scope of the Worker's Compensation Act, *Davis,* 663 N.E.2d at 1179, and the Act itself provides that it is the exclusive remedy for employment-related injuries which occur by accident. *Lawson,* 678 N.E.2d at 125. Thus, in a case involving an employee, once the defendant raises the issue of the exclusivity of the Act, the burden shifts to the employee to prove that the claim falls outside the scope of the Act. *Davis,* 663 N.E.2d at 1179. When reviewing the trial court's determination that it lacks subject matter jurisdiction, we will affirm the judgment on any theory supported by the evidence of record. *Id.*

## DISCUSSION AND DECISION

■ The trial court found that Nowicki and Battreall were both employed by Custom, thus barring Nowicki's claim as a result of the exclusivity provision of the Worker's Compensation Act. Nowicki argues that Battreall was employed only by Cannon, and that an employer-employee relationship did not exist between Battreall and Custom. However, Battreall's employment by Cannon does not exclude him from also being an employee of Custom. Where two employers so associate themselves together that both are in direct control of the employee and he is made accountable to both, he will be considered an employee of both employers.

2. There is a question whether Battreall was signaled in error by a Custom employee to raise the truss or whether Battreall accidentally raised the truss.

*U.S. Metalsource Corp. v. Simpson*, 649 N.E.2d 682, 685 (Ind.Ct.App.1995). The same person may act as an employee of one entity in certain aspects of a transaction and as an employee of another in a different part of the business. *Id.* An important question in the dual employment context is whether both employers possess a substantial, but not necessarily exclusive, right or power of control over the employee and the means, manner and method of his performance. *Id.*

■ Our supreme court has established, and the trial court applied, a seven-part test to determine whether such a relationship exists for purposes of the Worker's Compensation Act. The seven factors are:

(1) the right to discharge; (2) the mode of payment; (3) supplying tools or equipment; (4) belief of the parties in the existence of an employer-employee relationship; (5) control over the means used in the results reached; (6) length of employment; and (7) establishment of the work boundaries.

*Hale v. Kemp*, 579 N.E.2d 63, 67 (Ind.1991). In order to support a determination that an employer-employee relationship exists between the parties, it is not necessary that all seven factors be present. Instead, if a majority of the factors is present, an employer-employee relationship exists. *See Davis*, 663 N.E.2d at 1180, citing *Fox v. Contract Beverage Packers, Inc.*, 398 N.E.2d 709, 712 (Ind. Ct.App.1980), *trans. denied.*

■ The findings which supported the trial court's conclusion that Battreall was an employee of Custom and that the Worker's Compensation Board thus had exclusive jurisdiction over Nowicki's claim were:

(1) Custom had at least an indirect right to discharge Battreall;

(2) Custom indirectly paid Battreall by reimbursing Cannon for Battreall's services;

(3) Cannon provided Battreall's tools and equipment;

(4) Custom had exclusive control and authority over Battreall pursuant to its contract

with Cannon, indicating the parties' belief that Battreall was a Custom employee;

(5) Custom controlled the manner and means of Battreall's completion of the job;

(6) The length of employment was less than one day; and

(7) Custom established Battreall's work boundaries.

1. *Right to Discharge*

■ The trial court's finding that Custom had an "indirect" right to discharge Battreall was supported by testimony by Battreall that Custom could fire him at any time for any reason and by testimony from several Custom employees that if they were dissatisfied with Battreall's performance, they would call Cannon and ask for a different crane operator.[3] We addressed a similar "indirect" right to discharge in *U.S. Metalsource*, 649 N.E.2d at 685. There, Simpson's employer, a trucking company, arranged with U.S. Metalsource for Simpson to haul some of Metalsource's products. We determined Simpson to be an employee of both Metalsource and the trucking company. While Metalsource could not discharge Simpson from his employment with the trucking company, we noted that it could terminate Simpson's employment with Metalsource by calling the trucking company and instructing it to send a different driver.

Nowicki acknowledges the *U.S. Metalsource* result, but notes there was no evidence that Cannon would have acceded to a request to replace Battreall with a different operator, and appears to argue that Custom never "retained any right to discharge the operator," Brief of the Appellant at 14, because there was no attempt to do so. It is not essential that a person actually be discharged before a right to discharge can be established. The trial court did not err in finding that Custom had an "indirect" right to discharge Nowicki.

---

3. Nowicki represents the testimony of the Custom employees as being that they "universally denied they had the right to discharge the crane operator from the job site." Brief of the Appel-

lant at 13. However, most of those employees also testified that if they were dissatisfied with Battreall's performance, they would call Cannon and ask for a different operator.

## 2. Mode of Payment

■ The trial court found that Custom paid for Battreall's services "indirectly by reimbursing Cannon Steel Erection Company for the services of the crane operator." R. at 450.[4] Indirect payment of this nature does not defeat the existence of an employment relationship. *E.g., Davis,* 663 N.E.2d at 1180 (crane operator was employee of lessee even though operator was not paid directly by lessee—instead, lessee paid lessor for operator's services).

## 3. Supplying Tools and Equipment

There was testimony that Cannon provided most of the equipment used in the crane operation, but that Custom provided a tag line which was necessary for the lifts.[5] Since most of the tools were provided by Cannon, this factor weighs against a co-employee relationship:

## 4. Mutual Belief in Existence of Employer–Employee Relationship

■ In *Hale,* our supreme court called the intent that an express or implied employment contract existed—that is, a mutual belief that an employer-employee relationship existed—the "primary consideration" in determining the status of a "loaned" employee. 579 N.E.2d at 67. The trial court here found that "[t]he belief of the parties is best determined from the terms of the contract, and the contract between Cannon Steel and Custom Woodcrafters provided that Custom Woodcrafters had exclusive control and authority over the crane operator." R. at 451. The section of the crane rental agreement upon which the trial court relied is entitled "Indemnification," and provides:

> Lessee [Custom] agrees that the equipment and all persons operating such equipment, including Lessor's [Cannon] employees, are under Lessee's exclusive jurisdiction, supervision and control and agrees to indemnify and save Lessor, its employees and agents harmless from all claims for death or injury to persons, including Lessor's employees, and from all

loss, damage or injury to property, including the equipment, arising in any manner out of Lessee's operation. Lessee's duty to indemnify hereunder shall include all costs or expenses arising out of all claims specified herein, including all court and/or arbitration costs, filing fees, attorneys fees and costs of settlement. Lessee shall not be required to indemnify Lessor for its sole negligence, but, Lessor's liability for damage caused by the sole negligence of Lessor, its agents and employees hereunder shall be limited to the amount of Lessor's liability insurance.

R. at 157.

Cannon asserts "the Crane Rental Agreement was an express contract of employment," Brief of Appellee Cannon Steel Erection Company at 25. We disagree. While this contractual provision may properly have been considered as evidence of the belief of the parties, we decline to hold that this provision, by itself, establishes that Custom had exclusive control and authority over Battreall for purposes of establishing an employment relationship.

■ This provision addresses only indemnification. An indemnification provision is one which covers the risk of harm sustained by third persons that might be caused by either party to the indemnity agreement. Such a provision shifts the financial burden for the ultimate payment of damages from the indemnitor to the indemnitor. *Morris v. McDonald's Corp.,* 650 N.E.2d 1219, 1222 (Ind.Ct.App.1995). Because such provisions are used primarily to allocate between the parties financial responsibility for damages claimed by a third party, they cannot, by themselves, determine employment status.

Thus, the statement in the indemnification provision before us to the effect that Custom had "exclusive jurisdiction, supervision and control" over Cannon's crane operator does not establish that Cannon's crane operator is necessarily an employee of Custom. However, the application of the indemnification provision of this contract is not necessary to a

---

4. Nowicki does not provide argument in his brief as to the effect of this factor.

5. Neither does Nowicki provide argument in his brief as to the effect of this factor.

542

determination that an employment relationship existed between Battreall and Custom.

We have found implied employment contracts in circumstances where it "was understood by both parties that [the employee] would be expected to work, at least to the extent of one day, or a period during that day when [employee] was needed, at the plant of [employer]." *Fox*, 398 N.E.2d at 712. We found an implied contract in similar circumstances in *Tapia v. Heavner*, 648 N.E.2d 1202, 1206 (Ind.Ct.App.1995):

> It was understood by both parties that Tapia would be expected to work, at least for part of her work day, at the offices of Ohlson & Associates. Indeed, in her deposition Tapia admitted that she "sort of" felt as though she had "two separate employers." *Record* at 22 (Deposition of Shabnam Tapia).

Battreall testified that he believed himself to be a Custom employee. In addition, there was testimony that the relationship between Custom and the crane operator was the same regardless of whether the portion of the agreement containing the indemnification provision was signed.[6] We cannot say the trial court's finding that the parties believed there was an employment relationship was clearly erroneous.

### 5. *Control over the Means Used in the Results Reached*

■ An important question in the dual employment context is whether "both employers possess a substantial, but not necessarily exclusive, right or power of control over the employee and the means, manner and method of his performance." *Id.*, quoting *Fox*, 398 N.E.2d at 711. Cannon argues Custom's right to control Battreall's performance of his duties was evidenced by the fact that Custom personnel told Battreall what to lift, when to lift the trusses, and where to

place them. There was evidence that Battreall could not begin a lift until signaled to by a Custom worker, and that after the lift started, Battreall was obliged to follow the signals of a Custom employee because Battreall's view of the roof was obscured by a wall. Custom employees determined what specific work Battreall was to do, and where and when he was to do it.

In *Davis*, we found sufficient control to demonstrate an employment relationship when employees of a crane lessee "directed [the crane operator] and determined which loads he lifted and how he lifted them." 663 N.E.2d at 1179. The crane operator there could refuse to perform any acts he thought were dangerous and the lessee's employees could stop the crane operator if they felt his actions were improper. *Id.*

Nowicki argues that even if Custom exerted some control over Battreall, it was not "substantial" enough to support the trial court's result. He describes evidence that Battreall was partly in control of how he did the lifts, and cites *Sharp v. LaBrec, Inc.*, 642 N.E.2d 990 (Ind.Ct.App.1994) and *Williams v. R.H. Marlin, Inc.*, 656 N.E.2d 1145 (Ind. Ct.App.1995) as authority for his argument that signaling a crane operator during a lift does not constitute "control" over the operator.

*Sharp* and *Williams* are distinguishable. Sharp involved the question of whether a crane operator had "exclusive control" sufficient to satisfy that element of the rule of *res ipsa loquitur* so as to support the giving of a *res ipsa loquitor* instruction. 642 N.E.2d at 995. We found that where the crane operator had lifted the load and had held it in a "locked down" position for several minutes before the load swung and hit the plaintiff, that was sufficient to show the crane operator had "exclusive control."[7] *Id.* at 994. In

---

**6.** For example, one Custom employee testified as follows:
Q. Irrespective of whether you have signed the top or bottom or both on those agreements that relationship did not change, correct?
A. Yes.
R. at 129-30.
Another employee testified as follows:
Q. So assuming you signed just the bottom or the top would the arrangement be any different

between Cannon Steel and Custom Woodcrafters?
A. Nope.
*Id.* at 239-40.

**7.** It should also be noted that the company that supplied the crane also supplied the employee who signaled the crane operator to raise and lower the load.

the present case, the accident occurred during Battreall's lowering of the load. As there was evidence that Custom employees directed Battreall when to raise or lower the load, this case, unlike *Sharp*, does not demonstrate the crane operator's "exclusive control."

In *Williams*, we stated that "[w]orkmen signaling to a crane operator with a 'thumbs up' hardly constitutes an assertion of control." 656 N.E.2d at 1153. However, the issue being addressed in *Williams* was not one solely of control. It was, instead, whether the crane operator was a "borrowed servant" or co-employee of the plaintiff. In *Williams*, the crane company had no contract with the plaintiff's employer, the subcontractor. The evidence was that the plaintiff's employer used the crane only occasionally for the purpose of having the subcontractor's employees lifted to the platform where they were working. There was no evidence of any "control" by the subcontractor other than its act of indicating when the employees should be raised.

In the present case, the Custom employees signaled Battreall what to lift, when to lift the trusses, and where to place them. In addition, Custom employees determined what specific work Battreall was to do, and where and when he was to do it. This is sufficient evidence to support the trial court's finding that Battreall was under Custom's control.

### 6. Length of Employment

■ The trial court determined that while Battreall was employed by Custom for less than one day, "[t]he length of employment ... was controlled by Custom Woodcrafters." R. at 451. Nowicki appears to argue that this factor was improperly applied because Custom was using Cannon's services on a "temporary basis" and for a very brief period. Brief of the Appellant at 19. However, our decisions suggest the actual length of the employment is not as important as the question of who *controls* the length of the employment. So, in *Fox*, we found that an employment relationship was indicated because "Contract [the 'borrowing' employer] determined the length of time Fox would be required to work at the plant." 398 N.E.2d at 712. By contrast, in *Hale*, our supreme court found that the plaintiff was not an employee of an independent contractor when the plaintiff's employer instructed plaintiff to stop the work he was doing for the employer and to help the subcontractor when summoned by the subcontractor. The court characterized the plaintiff's work for the subcontractor as "casual." 579 N.E.2d at 67.

In the present case, Custom determined how many trusses would need to be set and the length of time it would require to set those trusses. The trial court did not err in finding that the length of the employment was determined by Custom.

### 7. Establishment of Work Boundaries

■ The trial court found that Custom established Battreall's work boundaries. Although Nowicki concedes that Cannon did not establish Battreall's work boundaries, he asserts that Custom did not do so either. Rather, he argues "the work boundaries were inherently set by the general contractor as the framing of each town home progressed." Brief of the Appellant at 20. Cannon argues the trial court's conclusion was sufficiently supported by evidence that Custom set the hours Battreall would work and controlled all the boundaries of his work insofar as it determined where he would be working and what he would be doing.

Our decisions provide little useful guidance for this factor, as those decisions which explicitly address it involve situations where the "borrowing" employer operated a plant or office where the "borrowed" employee was sent to work. *E.g., Fox* (temporary help agency employee assigned to plant) and *U.S. Metalsource* (truck driver assigned to haul product from steel plant). In *U.S. Metalsource*, we noted that on some days, "circumstances would require Metalsource to call [the driver] to change his route to accommodate different buyers. No approval from [the trucking company] was required for this change in route." 649 N.E.2d at 685. We did not link that fact explicitly to the "work boundaries" factor.

To the extent neither Cannon nor Custom could be said to have established spatial boundaries for Battreall's work, this factor

**544**

may not be applicable here. Our decisions do not indicate whether temporal or other "boundaries" may be implicated as well. Boundaries other than spatial ones might more appropriately be analyzed under the "control" factor.[8] That appears to be the approach we took in *Williams,* where, under the subheading "(7) Work Boundaries", we stated only: "*See supra* (5) Control." 656 N.E.2d at 1153. In light of the extent of Custom's control of Battreall's work at the Custom job site, we cannot say the trial court finding that Custom established Battreall's work boundaries was clearly erroneous.

## CONCLUSION

The trial court properly determined that Cannon's crane operator was also an employee of Custom when Nowicki was injured, and its dismissal of Nowicki's complaint is affirmed.

Affirmed.

FRIEDLANDER, J., concurs.

KIRSCH, J., dissents with opinion.

KIRSCH, Judge, *dissenting.*

I respectfully dissent.

My dissent is not from the majority's statement of the law. The majority clearly, correctly and articulately analyzes the seven factors set forth by our supreme court in *Hale v. Kemp,* 579 N.E.2d 63 (Ind.1991), reviews the evidence on each of the factors and holds that the evidence is sufficient on a sufficient number of the factors to conclude that the trial court's decision was not clearly erroneous.

Rather, my dissent is based on public policy concerns and what I believe to be a misapplication of such concerns by our courts. In its opinion, the majority iterates the oft-repeated statement that "public policy favors the inclusion of employees within the scope of the Worker's Compensation Act," citing *Davis v. Central Rent-A-Crane,* 663 N.E.2d 1177, 1179 (Ind.Ct.App.1996). The purpose underlying this policy was to insure that workers injured in workplace accidents in the course of their employment would receive the health and disability benefits mandated by the act. The purpose was not to immunize third-party tort feasors and their liability insurers from liability for negligence which results in serious injuries to one who is not in their employ. And yet, that is the result of the application of the foregoing policy to cases such as the one now before us.

It is from the application of this policy that the burden is shifted to the injured employee to prove that the claim falls outside the coverage of the act. *Davis,* 663 N.E.2d at 1179. Here, the trial court concluded that the employee had failed to meet his burden and the majority holds that conclusion was not clear-

---

**8.** The first Indiana decision to articulate the "establishing of work boundaries" as one of the indicia of an employment relationship appears to be *Gibbs v. Miller,* 152 Ind.App. 326, 330, 283 N.E.2d 592, 595 (1972). *Gibbs* cites to *Lazarus v. Scherer,* 92 Ind.App. 90, 174 N.E. 293 (1931) and to the Restatement (Second) of Agency § 220 (1958); however, neither authority explicitly mentions "work boundaries" as a factor. In *Lazarus,* we noted that the plaintiff was on the defendant's premises and engaged in work for the defendant's benefit when the injury took place. We went on to state that the "decisive test" of an employment relationship was the right of control. 92 Ind.App. at 98, 174 N.E. at 295.

The Restatement does indicate that one factor to be considered in determining whether one acting for another is a servant or an independent contractor is who provides "the place of work for the person doing the work." Restatement (Second) of Agency § 220(2). Comment (1) to that section states in part:

> If work is done upon the premises of the employer with his machinery by workmen who agree to obey general rules for the regulation of the conduct of employees, the inference is strong that such workmen are servants of the owner ... if, however, rules are made only for general policing of the premises, as where a number of separate groups of workmen are employed in erecting a building, mere conformity to such regulations does not indicate that the workmen are servants of the person making the rules.

So, like *Lazarus,* the Restatement suggests work boundaries are significant in a dual employment context only to the extent they evidence which entity exercises the greater control over the employee. *And see, e.g., Thompson v. Travelers Indem. Co. of R.I.,* 777 S.W.2d 722, 722 (Tex.App. 1989) (right to control the details of work "is shown by such matters as when and where to begin and stop work.").

ly erroneous. While there is clearly some evidence to support the trial court's conclusions on each of the seven *Hale* factors, that evidence is not conclusive on any of the factors and, if the burden were not shifted to the injured employee, would clearly support a contrary conclusion.

By way of example, I point to the first two conclusions of the trial court, that Custom indirectly retained a right to discharge and indirectly paid the crane operator. The evidence supporting these conclusions was that Custom could have requested Cannon assign a different crane operator if it was dissatisfied with the one assigned and that Custom paid Cannon for the services of the operator and Cannon in turn compensated the operator. Virtually every independent contractor arrangement involves such indirect rights and obligations.

If it is the public policy of this state to allow third-party tort feasors and their liability insurers to use the Indiana Worker's Compensation Act as a shield by which to immunize themselves from liability for their wrongful acts resulting in serious injuries to the employee of another, then it is a policy which should be re-examined. I would not apply the policy in this way, would not shift the burden to the injured employee, and would remand this case to the trial court for further consideration.