**Randall FARR and Ramona Farr, Appellants–Plaintiffs,**

**v.**

**LAIDIG CONCRETE, INC., Appellee–Defendant.**

No. 71A04–0311–CV–589.

Court of Appeals of Indiana.

June 29, 2004.

Timothy J. Walsh, Anderson Agostino & Keller, South Bend, IN, Attorney for Appellant.

Scott A. Loitz, Jones Obenchain, LLP, South Bend, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Randall Farr and Ramona Farr appeal from the trial court's entry of summary judgment in favor of Laidig Concrete, Inc.

We affirm.

### ISSUE

Whether genuine issues of material fact exist to preclude the entry of summary judgment in favor of Laidig Concrete.

### FACTS

Randall Farr was employed by Family Builders, Inc. as a master carpenter. Family Builders primarily provided fram-

ing for residences. Sometime in June 2000, a co-owner of Family Builders, Matthew Zimmer, contacted Matt Laidig, the owner of Laidig Concrete, about Family Builders using a boom truck owned by Laidig in order to set roofing trusses. Laidig agreed that Family Builders could use the boom truck provided that Laidig Concrete was not using the truck that day. Although a rental fee was paid by Family Builders, both Laidig and Zimmer considered the use of the boom truck as a "favor." (App. 42, 46).

When Laidig discovered that neither Zimmer nor any other Family Builder employee had a commercial drivers' license ("CDL"), as required to drive the boom truck on public streets, Laidig offered to have Thomas Gapinski, one of Laidig's employees, drive the truck to Family Builders' jobsite. No CDL is required to operate a boom truck at a jobsite. Laidig and Zimmer did not discuss any specifics as to insurance coverage or Gapinski's employment for the day that Family Builders used the boom truck. Laidig intended to pay Gapinski's wages from the proceeds of the rental fee received from Family Builders for the use of the boom truck.

Gapinski's primary function at Laidig Concrete was to drive the boom truck and set, and then later remove, concrete molds. As noted, Family Builders primarily worked as framers for residential homes. Laidig Concrete had never provided concrete work for Family Builders. Further, no work was to be performed for Laidig Concrete at the Family Builders' jobsite on the day that Family Builders used the boom truck.

On July 3, 2000, Gapinski drove the boom truck to Family Builders' jobsite. Zimmer's arrangement with Laidig did not include the use of the boom truck driver to set the trusses. Nonetheless, when Gapinski arrived at the jobsite, Zimmer "instructed him [on] ... how we wanted it set and in what order and ... how it would go." (App. 39). Although Zimmer was qualified to operate the boom truck at the jobsite, he "allowed" Gapinski to operate the truck because otherwise Gapinski would just be sitting around waiting for the completion of the work in order to drive the truck back. (App. 40–41).

While Gapinski was assisting in the placement of the trusses, Zimmer did not control the operation of the boom truck. Gapinski stated: "I had total control of the boom truck itself. I knew what I was doing with that, to raise it up and lower it down." (App. 77). Further, Gapinski stated that he determined where to position the boom truck. However, Zimmer and Family Builders' employees did motion to Gapinski the directions to move the trusses. As to Zimmer's ability to control Gapinski's actions that day, Gapinski stated: "He told me exactly what to do that day." (App. 76).

As Farr was attaching trusses to the boom, and after five trusses had been placed, Zimmer saw that the boom "bumped [Farr], he stumbled a little bit because of the terrain there. And he probably walked over four feet ... to catch his balance." (App. 40). Farr described the incident slightly differently. He believed the boom arm struck him in the shoulder blade at the same time the chain struck him in the left hip or buttock. He acknowledged that he did not fall from the incident, but the boom arm pushed him into a co-worker and he had to run on his toes to catch his balance. Although Farr immediately felt pain, he continued to work for the rest of the day. He worked for Family Builders through July 9, 2000.

On January 8, 2002, Farr filed a complaint for damages against Laidig Concrete, Inc. alleging that on July 3, 2000 he was injured when he was struck by a boom operated by a Laidig Concrete employee.

Farr alleged: "Defendant is liable for the negligence of its employee working within the scope of his employment under the doctrine of respondeat superior and/or vicarious liability." (App. 11). Ramona Farr, Farr's wife, asserted a derivative claim for the "lost ... care, comfort and companionship of her spouse." (App. 13).

On November 5, 2002, Zimmer, Laidig, Gapinski, and Farr gave deposition testimony. On February 21, 2003, Laidig Concrete filed its motion for summary judgment. Laidig Concrete urged that Family Builders was the "special employer" of Gapinski on July 3, 2000; that pursuant to the borrowed servant doctrine, Family Builders was responsible for Gapinski's actions under a theory of respondeat superior. (App. 28). Farr opposed summary judgment urging that under either a three-part test or a seven-part test, the question of whether someone is in another's employ is a question of fact and that genuine issues of material fact were present, thereby precluding summary judgment.

A hearing was held on summary judgment on May 12, 2003. On October 24, 2003, the trial court entered an order granting summary judgment for Laidig Concrete.

## DECISION

When reviewing a determination on summary judgment, we apply the same standard employed by the trial court to evaluate whether the motion should be granted. *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1272 (Ind.Ct.App. 2001). Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Warner Trucking, Inc. v. Carolina Casualty Ins. Co.*, 686 N.E.2d 102, 104 (Ind. 1997); Ind. Trial Rule 56(C). The existence of conflicting facts and inferences as to certain elements of a claim will not foreclose summary judgment where there is no real conflict regarding the facts which are dispositive of the claim. *Blackwell v. Dykes Funeral Homes, Inc.*, 771 N.E.2d 692, 695 (Ind.Ct.App.2002).

As a preliminary matter, the parties disagree as to the correct test to use in order to determine Gapinski's employment status during his operation of the boom truck for Family Builders. Laidig Concrete advocates the three-part test under the borrowed servant doctrine that was used in *Progressive Constr. & Eng'g Co. v. Indiana & Mich. Elec. Co., Inc.*, 533 N.E.2d 1279, 1284 (Ind.Ct.App.1989) (borrowed servant doctrine states that "an employee while generally employed by one party, may be loaned to another in such a manner that the special employer may be responsible for the acts of the employee under the doctrine of *respondeat superior*" (quoting *New York Centr. R.R. Co. v. NIPSCO*, 140 Ind.App. 79, 84, 221 N.E.2d 442, 446 (1966))). *Progressive* provides:

> To determine which employer is liable for the servant's negligence three related analyses have been developed: (1) the "whose business" test which seeks to discern whether the tortfeasor was furthering the business of the special or general employer at the time of the collision; (2) the "control" test which attempts to determine which employer had the right to control the specific act in question; and (3) the "scope of business" test which attempts to determine if the work being done by the servant is within the scope of the business of the special employer, if so then the liability for the servant's acts lies with the special employer.

*Progressive*, 533 N.E.2d at 1284.

■ Farr recognized the three-part test but then analyzed the question of whether Family Builders was Gapinski's special

employer at the time of injury by using a seven-part test described in *Hale v. Kemp,* 579 N.E.2d 63, 67 (Ind.1991), which analyzed whether Kemp was an employee/borrowed servant of a painting contractor for worker's compensation purposes at the time he was injured. The *Hale* court stated:

> To determine if an employer-employee relationship exists which may subject an employee to the Worker's Compensation Act so as to bar his common law claim against the special employer to whom he was "loaned," the following factors have been enumerated: (1) the right to discharge; (2) the mode of payment; (3) supplying tools or equipment; (4) belief of the parties in the existence of an employer-employee relationship; (5) control over the means used in the results reached; (6) length of employment; and (7) establishment of work boundaries.

*Id.; see also GKN Co. v. Magness,* 744 N.E.2d 397, 401 (Ind.2001). "[T]he right to exercise control over the manner and means by which the work is to be accomplished is the most important consideration." *Fioretti v. Aztar Indiana Gaming Co., LLC,* 790 N.E.2d 587, 589 (Ind.Ct. App.2003) (quoting *Moberly v. Day,* 757 N.E.2d 1007, 1010 n. 3 (Ind.2001)).

The *Hale* test has been used or recognized in a variety of employee/worker's compensation/borrowed servant cases. *See e.g., GKN,* 744 N.E.2d at 400 (exclusivity of worker's compensation act in action against general contractor by employee of subcontractor); *Verma v. D.T. Carpentry, LLC,* 805 N.E.2d 430, 433–34 (Ind.Ct.App. 2004) (whether crane operator was borrowed employee of subcontractor for worker's compensation purposes); *Fioretti,* 790 N.E.2d at 589 (question whether actor was employee or agent of party); *Nowicki v. Cannon Steel Erection Co.,* 711 N.E.2d 536, 539–40 (Ind.Ct.App.1999) (whether ac-

tor was "employed" by two different employers for certain aspects of transaction); *Williams v. R.H. Marlin, Inc.,* 656 N.E.2d 1145, 1151 (Ind.Ct.App.1995) (whether actor employed by special employer such that he was a borrowed servant). Moreover, this court in *Williams,* noted that other tests exist as well. *Williams,* 656 N.E.2d at 1151 (noting the "refined framework" test).

Patently, any expansion or refinement of the tests to determine whether an actor is an employee of another occurred in an effort to provide as much guidance as possible in an amorphic area. In this case, whether we were to use the three-part general test or the more specific seven-part test, the result is the same. However, our supreme court in *GKN,* stated:

> A number of cases suggest that if a majority of the seven *Hale* factors is present, then an employer-employee relationship exists. However, consistent with *Hale,* we now reaffirm that the factors must be weighed against each other as a part of a balancing test as opposed to a mathematical formula where the majority wins. . . . [W]hen applying this balancing test, the trial court should give the greatest weight to the right of the employer to exercise control over the employee.

*GKN,* 744 N.E.2d at 402.

■ The agreement between Laidig Concrete and Family Builders for Family Builders use of the boom truck was an unstructured transaction. Because the injury to Farr occurred on the very first occasion that Laidig Concrete and Family Builders entered into such a transaction, no history or course of dealings are available for analysis of the factors. Thus, we have very little evidence on many of the factors within the seven-part test, with the exception of the most important factor—control.

General evidence exists relating to some of the factors. Laidig sent Gapinski to the Family Builders jobsite for the sole purpose of transporting the boom truck for Family Builders' use. While a rental fee was paid by Family Builders for use of the truck, there was no agreement or separate compensation to Laidig Concrete for the use of Gapinski by Family Builders. In fact, both Laidig and Zimmer considered the transaction in the nature of a favor. Laidig Concrete did not have a presence at the Family Builders jobsite, and neither Gapinski nor any Family Builders' employees were advancing the business of Laidig Concrete at the jobsite that day. While Zimmer could not make the decision to discharge Gapinski from Laidig Concrete, he could have ordered Gapinski from the Family Builders jobsite. As noted above, Zimmer's use of the boom truck at the jobsite did not hinge upon Gapinski's operation of the truck. Laidig knew, and Zimmer testified, that Zimmer had operated boom trucks in the past; moreover, no CDL was required for such operation.

As to control, some specific evidence exists. When Gapinski arrived at the Family Builders' jobsite, Zimmer decided to use Gapinski to set the trusses rather than have Gapinski stay idle waiting to return the boom truck to Laidig Concrete. Although Gapinski determined where to place the boom truck[1] and had complete control over the operation of the truck as to raising and lowering the boom, Gapinski stated that Zimmer had total control over the work that Gapinski performed at the jobsite. Zimmer "instructed [Gapinski] ... how [Zimmer] wanted it set and in what order and ... how it would go." (App. 39). Family Builders' employees directed Gapinski in setting the trusses. There is no evidence that Laidig Concrete or Gapinski had any control over the work performed at the jobsite.

The undisputed evidence demonstrates that Family Builders was the special employer of Gapinski and that Gapinski was a borrowed employee on the day that he operated Laidig Concrete's boom truck for Family Builders at the Family Builders jobsite. Thus, the trial court properly granted summary judgment in favor of Laidig Concrete.

The judgment of the trial court is affirmed.

SHARPNACK, J., and ROBB, J., concur.

---

1. Gapinski testified that there was only one logical place for the boom truck to be sta-tioned.