# FIELD v. CAMPBELL, ADMINISTRATOR.

[No. 20,479. Filed November 16, 1904. Rehearing denied March 16, 1905.]

1. HUSBAND AND WIFE.—*Contracts.*—*Suretyship.*—*Consideration.*— Whether the contract of a married woman is one of suretyship, is to be determined not by the form of the contract, but by the inquiry whether she received the consideration in person or in benefit to her separate estate. p. 393.

2. SAME.—*Suretyship.*—*Form of Contract.*—*Disposal of Consideration.*—A married woman may borrow money for herself, and her subsequent disposition of the money will not invalidate her contract, but she can not by indirection evade the statute prohibiting suretyship and in such manner bind herself. p. 393.

3. SAME.—*Suretyship.*—*Knowledge.*—Any one loaning money to a married woman must know that she is powerless to become surety, and he must satisfy himself by active diligence and inquiry that she is in fact a principal, and it may be necessary under certain circumstances not to be satisfied with her general statements as to her purpose in making the loan. p. 394.

4. PRINCIPAL AND AGENT.—*Notice to Agent.*—Notice to an agent is notice to the principal. p. 395.

5. NOTICE.—*Mortgage.*—*Public Records.*—The record of a mortgage in the recorder's office is notice to all dealing with the title. p. 397.

6. SAME.—*Records.*—*Agents.*—Notice actually given to an agent or that furnished by the public records is the equivalent of actual notice to the principal. p. 397.

7. HUSBAND AND WIFE. — *Suretyship.* — *Notice.* — The fact that the plaintiff in loaning $3,000 to a married woman knew that such woman had executed a mortgage of indemnity on her lands; that her husband's liabilities on his official bond were $12,000, of which the plaintiff had loaned such husband $9,000 on an application for $12,000; that plaintiff's agent was given the $3,000 with instructions to turn it over to such wife on satisfaction of such indemnity mortgage; and the fact that the husband, the wife and plaintiff's agent were together and the husband's successor in office was waiting at the bank, to the knowledge of such agent, when the negotiations were completed and money paid, is sufficient to show that plaintiff knew that such woman was not principal in said transaction. p. 398.

8. ESTOPPEL.—*In Pais.*—*Married Woman.*—*Suretyship.*—The mere answer that money borrowed was "for her own use" does not estop a married woman from showing that she was surety when the lender knew of facts and circumstances calling on him to make more specific inquiry. p. 398.

9. . Husband and Wife.—*Contracts.*—*Suretyship.*—*Duty to Inquire.*— While a married woman may not use her inability to become surety for the perpetration of fraud, still it is the duty of the lender to inquire specially into the purpose of the loan, especially when there are circumstances indicating that she might desire the money for the husband's use.    p. 399.

10. Appeal and Error.—*General Finding.*—*When Question of Law.* —A general finding upon uncontradicted evidence does not present a question of the weight of the evidence, but is a question of the legal effect of such evidence.    p. 400.

11. Husband and Wife.—*Power to Borrow Money to Pay Former Suretyship Debt.*—A married woman has no power to become a principal in a loan made to pay a former suretyship debt.    p. 400.

12. Same.—*Estoppel in Pais.*—A married woman may by deceit estop herself from denying that she is a principal in a loan to pay a suretyship debt.    p. 401.

13. Same.—*Suretyship.*—*Estoppel.*—In the absence of an estoppel *in pais* a married woman is not bound by a contract to repay money used to pay another's debts.    p. 403.

From Washington Circuit Court; *W. C. Utz,* Special Judge.

Action by John A. Campbell as administrator of the estate of Van R. Noblett, deceased, against Matilda E. Field. From a decree for plaintiff, defendant appeals. Transferred from Appellate Court under subdivision 2, §1337j Burns 1901, Acts 1901, p. 565. *Reversed.*

*Gavin & Davis, M. B. Hottell, J. J. Giles* and *McCart & Talbot,* for appellant.

*Elliott, Elliott & Littleton* and *W. J. Buskirk,* for appellee.

Gillett, J.—This is a second appeal. See *Field* v. *Noblett* (1901), 154 Ind. 357. As the action now stands, John A. Campbell, as administrator of the estate of Van R. Noblett, deceased, is seeking to recover against appellant on a note and to foreclose a real estate mortgage which she and her husband executed to secure said note. Certain special paragraphs of answer sufficiently present the question of her suretyship. The general denial and special paragraphs of estoppel were pleaded by way of reply. The court found for

appellee, and rendered a judgment and a decree in his favor. The question is duly presented whether the finding was contrary to law.

It appears from the evidence that in November, 1890, the term of Joseph J. Field as treasurer of Orange county expired. He was owing at the time, on account of his office, about $12,000, but the deficit was not discovered until subsequently, when a report was made to the State. January 10, 1891, he and his wife, the appellant herein, executed to his bondsmen a mortgage covering all of the real estate of each of said mortgagors, conditioned to save the mortgagees harmless on account of their suretyship. The mortgage was recorded January 12, 1891. A few days subsequently, Joseph J. Field applied to Van R. Noblett for a loan of the above amount, and proposed to secure the same by a mortgage upon his own real estate. Noblett offered to loan $9,000 on said real estate, but declined to loan more, for the reason that he regarded the security as insufficient. A few days later appellant applied in person to Noblett to borrow $3,000 upon her real estate. He asked her if she wanted the money for her own use, and she answered that she did. Noblett stated that he was willing to make the loan, provided the title was good and unincumbered and the land worth $6,000, she to pay the expense of the transaction. Appellant agreed to his proposition. He then directed one Hicks, who was at the time the cashier of a bank at Orleans, Indiana, to appraise the land, and, if it was worth $6,000, he was authorized to procure an abstract, and determine whether the title was good and unincumbered, and, if so, he was to make the loan. As to the relation of Hicks to the transaction, Noblett testified in part as follows: "I authorized Hicks to go and get the abstract and find out if the—whether it was good and unincumbered, and if he thought it was then he might take the mortgage for this amount." On cross-examination Noblett was asked this question: "Didn't you learn, Mr. Noblett, that

Mrs. Field and her husband had mortgaged all of his prop-, erty, and also her property, for the purpose of saving harmless the bondsmen of Mr. Field, while he was treasurer?" The witness answered: "Well, I'd heard say. I knew that. They had some fear about that—that their property was all mortgaged." Hicks appraised the lands offered as security for each loan, and he also procured and passed on the abstracts. Noblett further testified on cross-examination that he received a report from Hicks that the title to the real estate of appellant was good; that there was no incumbrance, and that it would be a sufficient security for $3,000. Afterwards, on February 2, 1891, Noblett deposited $12,000 in said bank, taking two certificates of deposit, one for $9,000 and the other for $3,000. The latter certificate was indorsed, "Pay to W. T. Hicks for benefit of Mrs. Matilda Field. Van R. Noblett," and the certificate was turned over to Hicks. The other certificate was apparently placed under the control of Hicks, since he closed up both loans. February 13, 1891, the bondsmen of Joseph J. Field executed to Hicks a power of attorney, authorizing him to release said indemnity mortgage upon the payment to the treasurer of Orange county of $12,701.74 "on the amount of his [Field's] indebtedness to said county." Hicks drew the notes and mortgages, and consummated both loans on the same day, February 14, 1891. On the morning of that day appellant came to the town of Orleans. She had no knowledge that a mortgage was to be executed at that time. A person, who was a notary public, met her at a drug store, and she there signed the note and mortgage in question, and also joined her husband in the $9,000 mortgage on his lands. She then accompanied the person who had taken her acknowledgment to the bank. One Ellis, who was her husband's successor in office, was in the bank at the time. Hicks counted out $3,000 to her, and she receipted the payment on the certificate. She took the money to the drug store at once, where her husband was in waiting, and

handed the money to him.   He immediately went with it to
the bank.   Ellis testified that on that day Field paid him
$3,000 in cash and $8,334.74 in a check or checks on said
bank, and that the aggregate of said amounts was the sum
then due from Field according to the footings of the books.
Hicks afterwards entered of record a release of the in-
demnity mortgage.   There is and can be no question made
upon the evidence that the $3,000 paid to Ellis was the
money received by appellant.   We are unable to find that
Noblett testified that he believed the statement of appellant
that "she desired the money for her own use" to be true.

1.   Counsel for appellant contend that the note and the
mortgage sued on are void under §6964 Burns 1901, §5119
R. S. 1881.   That section is as follows:   "A married woman
shall not enter into any contract of suretyship, whether as
indorser, guarantor, or in any other manner; and such con-
tract, as to her, shall be void."   It is the contention of ap-
pellee's counsel that the loan was made to appellant upon
the representation that she desired it for her own use, and
that Noblett was not bound to see to the application of the
money which he furnished her.   It is settled law in this
State that whether or not a married woman is surety or
principal on a promissory note or other obligation is to be
determined, not from the form of the contract, nor from the
basis upon which the transaction was had, but from the
inquiry as to whether she received in person or in benefit
to her estate the consideration upon which the contract de-
pends.   *Field* v. *Noblett, supra; Harbaugh* v. *Tanner*
(1904), 163 Ind. 574, and cases cited.

2.   It does not admit of question that a married woman
may borrow money for herself, and that her subsequent dis-
position of it, whatever that may be, will not invalidate her
promise to repay.   *Bouvey* v. *McNeal* (1891), 126 Ind.
541; *Cummings* v. *Martin* (1891), 128 Ind. 20.   If, how-
ever, it appears that an elaboration of outward details was,
as both parties knew, but a cloak to cover an attempt to

conclude a contract in violation of the statute, the indirection in method by which they have proceeded will not avail to save the transaction. *Webb* v. *John Hancock, etc., Ins. Co.* (1904), 162 Ind. 616; *Long* v. *Crosson* (1889), 119 Ind. 3, 4 L. R. A. 783. As was said in the case last cited: "Whatever device may be resorted to for the purpose of evading the statute, if the person seeking to enforce the contract knew of, or participated in, the design, or purposely remained ignorant, courts will deal with the transaction according to its substance, regardless of the form in which it may have been disguised."

3. But it is not necessary that the party loaning the money should actually have been a party to the violation of the statute. Being advised of the fact that the woman is covert, he stands charged with a knowledge of her disability. A married woman has no power to deal as principal if she is in fact a surety. *Vogel* v. *Leichner* (1885), 102 Ind. 55; *Andrysiak* v. *Satkoski* (1902), 159 Ind. 428. There can be no evasion of the statute upon the part of the person who accepts an obligation that the woman is powerless to issue, and she could not escape the statutory prohibition except for the fact that she may be bound by an estoppel *in pais.* As the statute puts a married woman under disability, there can be no recovery upon her suretyship undertaking, except where the facts were such that the person who accepted it was reasonably justified in supposing, and did suppose, that she was not only a principal in name, but also in fact. In all ordinary circumstances, at least, there must be some degree of active diligence upon the part of a lender to ascertain the purpose for which a woman whom he knows to be married is borrowing money. It was said in *Cupp* v. *Campbell* (1885), 103 Ind. 213: "One contracting an encumbrance on the estate of a married woman, can not, however, deal with her at arm's length, knowing that she is married, and that by law she is prohibited from contracting for the benefit of another; and, knowing that she is about to

encumber her separate estate in his favor, he is bound to inquire concerning the consideration, and ascertain, if he· may, by reasonable inquiry from her whether it is for her benefit or for the benefit of another, and unless misled by the conduct or representations of the wife, he will be held to have acquired a knowledge of the facts which prudent inquiry would have disclosed." There may be a necessity of further inquiry, despite the general affirmation of the woman that she desires the money for her own use, in cases where the circumstances are such as to admonish the lender that probably she is seeking to evade the statute. This is the effect of the opinion in *Ward* v. *Berkshire Life Ins. Co.* (1886), 108 Ind. 301, where it was said: "It is not material that there was a secret agreement between the husband and wife, for the appellee could not be prejudiced by an agreement of which it had no notice. The question is, not what facts were known to the mortgagors, but what facts did the appellee have knowledge of, or ought it under the circumstances to be charged with having knowledge of? It is true that the appellee, having notice of Mrs. Ward's coverture, was bound to inquire whether she had capacity to make the contract; but when reasonable care and diligence are exercised, the party contracting with the married woman may rely upon her representations. *Cupp* v. *Campbell* [1885], 103 Ind. 213. Here reasonable care and diligence were exercised, for no other person than the married woman could so well inform the lender what she intended to do with the money obtained upon the mortgage, and there were no circumstances indicating that her representations were untrue, or even subjecting them to suspicion."

4. In determining the extent that Noblett had notice of what was to be done with the money received by appellant, it is important to consider what notice he himself had, and the notice, if not the actual knowledge, which his agent Hicks had, and the notice based on the record. Notwithstanding any conclusions indulged in by Hicks in his testimony, it is

plain that he was an agent of Noblett, not only to appraise the land, but to pass upon the title and conclude the loan. All this was within the scope of his agency, and to the extent that he had notice or knowledge must notice or knowledge be imputed to his principal. It is laid down in Story, Agency (9th ed.), §140, that "Notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of his agency; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal; and if he has not, still the principal, having entrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal." It was said by Lord Brougham in *Kennedy* v. *Green* (1834), 3 Myl. & K. 699: "The doctrine of constructive notice depends upon two considerations: (1) That certain things existing in the relation or the conduct of parties, or in the case between them, beget a presumption so strong of actual knowledge, that the law holds the knowledge to exist, because it is highly improbable it should not; and next, that policy, and the safety of the public, forbids a person to deny knowledge while he is so dealing as to keep himself ignorant, or so as that he may keep himself ignorant, and yet all the while let his agent know, and himself, perhaps, profit by that knowledge. In such a case it would be most iniquitous and most dangerous, and give shelter and encouragement to all kinds of fraud, were the law not to consider the knowledge of one as common to both, whether it be so in fact or not." A writer on the law of agency states the doctrine thus: "The principal is chargeable with notice of all the material facts that come to the knowledge of his agent in a transaction in which the agent is acting for the principal. If this were not so a purchaser could always free himself from the possible equities arising from the acquisition of knowledge of adverse rights in or to the property purchased, by purchasing through an

agent. It is against the policy of the law to place one who deals through an agent in a better position than one who deals in person." Huffcut, Agency (2d ed.), §141. "My solicitor," as was said in an English case, "is *alter ego;* he is myself; I stand in precisely the same position as he does in the transaction, and therefore his knowledge is my knowledge; and it would be a monstrous injustice that I should have the advantage of what he knows without the disadvantage." *Boursot* v. *Savage* (1866), L. R. 2 Eq. 134.

5. The fact that the mortgage to the bondsmen of the husband was of record lifts the information which Noblett admits that he had concerning it above the plane of mere rumor, if his answer upon the stand is to be so construed. "Any instrument affecting the title, which is properly recorded, is absolute notice to every one subsequently dealing with the title, irrespective of whether such person has examined the records, or even had an opportunity to make an examination." Wade, Notice (2d ed.), §97. See, also, *Webb* v. *John Hancock, etc., Ins. Co.* (1904), 162 Ind. 616; *McPherson* v. *Rollins* (1887), 107 N. Y. 316, 14 N. E. 411, 1 Am. St. 826.

6. Taken as a whole, the authorities warrant the assertion that the notice which the law imputes from notice to an agent, or from the fact that an instrument in the chain of title is properly of record, is the equivalent of actual notice. We are not unmindful that a false representation might sometimes lead a person who contemplated loaning money on real estate security to omit to examine the record, but we fail to perceive how the effect of such a representation would be to prevent an agent from informing his principal of facts which it was nevertheless the agent's duty to communicate, or why that should furnish any reason for not conclusively presuming, as in other cases, that the duty of the agent to communicate facts of importance to his principal was discharged. And the indulgence of this presumption in the case before us, thereby infecting Noblett with the

notice of Hicks, makes it just, as we think, to hold that the representation of appellant was not of such a character as to relieve Noblett of the imputation of record notice.

7. Focusing all elements of notice in Noblett, we find that before the loan was made he knew that Field and his wife had executed a mortgage of indemnity on all of the property belonging to each of them to the sureties on Field's official bond; that the bondsmen's liability was estimated by them at a sum approximating $12,000; that Field had sought to borrow $12,000 on his property, but not being able to borrow more than $9,000 had arranged to obtain the latter sum; that his wife was seeking to borrow on her property a sum equal to the difference between $9,000 and $12,-000; that after the full sum of $12,000 had been promised, and the money deposited in the bank to make the loans, the bondsmen had placed in the hands of the agent a power of attorney to release the indemnity mortgage, in apparent anticipation that an amount approximating the aggregate of the proposed loans would be paid; and, in addition to all this, Noblett had notice that the treasurer was actually in the bank while Field and his wife were closing up their respective transactions with Hicks. The fact that the procuring of said loans and the paying off of Field's public indebtedness were transactions dependent on each other could not have escaped the notice of Hicks, since an obedience to the injunction to see that the land was unencumbered made it his particular duty to ascertain whether the money borrowed was to be used in such a way that as attorney in fact he would be able to release the indemnity mortgage.

8. As to the answer which Noblett testified that he received from appellant in response to his mild and general question, it must be said, in view of the circumstances, that the meaning of her statement was at least problematical. It might have meant that the money was to be applied for the benefit of herself or of her separate estate, or there was

room for the construction that she answered that the money was "for her own use" in the sense of "Is it not lawful for me to do what I will with mine own?" Noblett's inquiry was a very scant one at the best, but in the light of the notice of facts with which he was charged before the loan was concluded it is clear that to have asked appellant the explicit question as to whether she intended to apply the money she was borrowing on her husband's shortage was the least that he could have done by way of inquiry to furnish a basis on which to charge appellant as a principal.

Had there been an effort to observe the statute upon the part of Noblett and his agent, we do not understand how they could have failed to perceive that every footprint having to do with the loan in question and its associated transactions indicated that the movement of events was toward the consummation of the encumbering of appellant's estate to raise money to apply on her husband's delinquency. It was said in *Webb v. John Hancock, etc., Ins. Co., supra*— a case very much like this in principle: "It would appear, when all of the facts and circumstances of which appellee had knowledge are considered, that its neglect to make further inquiry can only be explained upon the theory that it desired to remain ignorant. It was not at liberty to close its eyes and make no further inquiry or investigation, and then, as it does in this action, attempt to shield itself upon the plea that it was ignorant of the purpose of appellants to evade the law by executing the conveyances in question."

9. The facts being without dispute, the question whether a lender made such inquiry as to warrant him in treating the woman as a principal is a question of law. While she can not use her disability as a means for the perpetration of fraud upon those who, after due inquiry, have treated her as engaged in the exercise of a power she undoubtedly possessed, yet such is her status that there must be circumstances of due inquiry to authorize her to be charged upon a contract which she has made in defiance of law. The stat-

ute represents a legitimate exercise of the power of the legislature to determine what is expedient. As to such an enactment it may be said that when the legislative department speaks it conclusively determines what the public policy of the State is, and it becomes the business of the courts to enforce the statute in dealing with transactions entered into in violation of its evident spirit, whatever their form, to the end that the declared policy of the State may prevail. The question in this case is whether there was due inquiry. We hold that the meager and almost ambiguous statement which Noblett elicited from appellant, when considered in the light of the fact that the circumstances from the beginning to the end conspired to warn him that she was seeking to violate the statute, was not sufficient to warrant him in dealing with her upon the assumption that she was a principal in the transaction. It was his duty to observe, and follow up by special inquiry, the clear indices of a purpose on her part to evade the law. Bearing in mind the fact that Noblett was not authorized to deal with appellant on the basis of her being *sui juris,* and that the statute is to be enforced against all who can not claim that after due care they were deceived into the belief that they were dealing with a principal, we deem it clear that there was in the transaction before us such a want of care to ascertain the purpose for which the loan was to be made that the transaction should be condemned as a violation of law.

10. The question is not presented to us as one involving the weight of the evidence. It is a case where the legal effect of the evidence was misapprehended by the trial court. *State, ex rel.,* v. *Forsythe* (1897), 147 Ind. 466, 33 L. R. A. 221.

11. We have thus far dealt with the question in hand upon the assumption that the contract of appellant was in fact one of suretyship, and but for the argument of counsel for appellee, we might close this opinion without discussion of this point. It was decided in *Andrysiak* v. *Satkoski*

(1902), 159 Ind. 428, that the fact that the payment of a debt by a wife relieves land in which she has an inchoate interest of a mortgage does not authorize her to be charged as principal. But it is contended that the indemnity mortgage was only voidable, since the statute provides that the class of obligations therein mentioned are void "as to her," thereby making her coverture a personal defense, and that, as she did not elect to avoid the mortgage, but chose rather to pay it, the note and the mortgage in suit were executed by her as a principal. While it is true that in some of our cases it has been stated that the suretyship obligation of a married woman is only voidable, yet such language has been used in pointing out the fact that under the terms of the statute the defense is of a personal nature. If the undertaking was of a character which the statute prohibited, it would not have such a status that her mere subsequent election to waive the defense could operate as a confirmation. See, *Voreis* v. *Nussbaum* (1892), 131 Ind. 267, 16 L. R. A. 45. It strikes us that to adopt the argument of counsel would be to attach importance to the shadow, rather than to the substance, which is the legislative enactment. Moreover, to hold that a married woman might execute a mortgage upon her property, purporting to render her liable as a guarantor to pay a debt previously incurred by another, and that she might then legally charge her estate by borrowing money to relieve her property of the mortgage, would be judicially to declare the open sesame which would swing wide the door to the nullification of the statute.

12. Whether the lender may be led in some instances to assume that the prior mortgage which his money is used to satisfy is a valid encumbrance is another question. As we have seen, she can not, except by conduct which is tantamount to deceit, and which actually does mislead, charge herself with any debt except for the benefit of herself or of her estate. The case of *Cupp* v. *Campbell* (1885), 103 Ind.

213, fully discusses and disposes of the contention of counsel with which we are now dealing, particularly since the prior mortgage in the case at bar showed on its face that it was executed by way of indemnity. In the case referred to it was said: "The question which remains is, can the wife be held on the·notes, and the mortgage in suit be enforced against her separate property, to the extent that the money secured thereby was used in discharging the invalid prior mortgage? We think that this question must be answered in the negative. * * * Where her estate is encumbered in such manner as that she is exposed to the hazard of losing it, even though such encumbrance is for the debt of another, it is manifestly beneficial that she should have the power to relieve it from the peril of such encumbrance, and when she and her husband contract a loan for that purpose, it can not be said that the consideration for such loan does not inure to her benefit. Where, however, an encumbrance is made on the wife's separate estate, to pay the husband's debt, or to remove an encumbrance which by the very terms of the statute she had no power to make, and which exposes her land to no peril whatever, we can discover no ground upon which it can be said that the consideration for an encumbrance so made inured to the benefit of the wife. One seeking to enforce a mortgage against the separate estate of a married woman must show by proof *aliunde* that the debt secured by the mortgage was either the debt of the wife, or that it inured to the benefit of her separate estate. *Bowman* v. *Kaufman* [1878], 30 La. Ann. 1021. And if nothing further can be shown than that it was to pay the husband's debt, to secure which a mortgage had previously been made, which was within an absolute statutory prohibition, we think there is a failure of proof. Unless there is at least a *bona fide* question as to the validity of the encumbrance, resting on some apparent foundation, the contract is one of suretyship." See, also, *Andrysiak* v. *Satkoski, supra.* It can make no manner of difference that appellant was given a

temporary possession of the money. There being no element of estoppel present, her original purpose in borrowing the money, and her subsequent application of it, must be regarded as component parts of what was an entire transaction.

13. The fact that Field and his wife were in dire need of money at the time of the transaction gave her no enlarged power to borrow money with a purpose to use it in paying the debt of her husband. We make no question about her right to apply her money to pay an indebtedness of his, but we hold that in the absence of an estoppel she can not enter into a valid contract to repay money borrowed by her for that purpose. The stress of circumstances in which the two were involved can not obscure the meaning of the statute. It was intended to prevent the making of contracts in the nature of suretyship undertakings by married women in all cases. In *Harbaugh* v. *Tanner* (1904), 163 Ind. 574, it was said: "One of the principal reasons for enacting the statute forbidding married women to enter into contracts of suretyship, and providing that such contracts were void, was to prevent them from squandering or encumbering their property as sureties for improvident husbands;" citing *Cummings* v. *Martin* (1891), 128 Ind. 20; *Voreis* v. *Nussbaum, supra.*

Judgment reversed, and a new trial ordered.