**SOUTHPORT LITTLE LEAGUE,**
Appellant–Defendant,

v.

Steven **VAUGHAN** and Rebecca **Vaughan, and Parents and Natural Guardians of M.V. and J.V., M.V., b/n/f Steven Vaughan and Rebecca Vaughan, and J.V., b/n/f Steven Vaughan and Rebecca Vaughan, Appellees–Plaintiffs.**

No. 49A02–9912–CV–882.

Court of Appeals of Indiana.

Aug. 28, 2000.

Shannon L. Robinson, Kelley, Belcher & Brown, Bloomington, Indiana, Attorney for Appellant.

Debra H. Miller, James R. Fisher, Ice, Miller, Donadio & Ryan, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

ROBB, Judge

The Southport Little League (the "Little League") appeals the jury verdict in favor of Steven Vaughan and Rebecca Vaughan individually, and as the parents and natural guardians of M.V. and J.V. (collectively referred to as "the Vaughans"), claiming that the trial court erred in denying its motion for summary judgment and judgment on the evidence. We affirm.

### Issues

The Little League raises the following restated issues for our review:

1. Whether the trial court properly denied the Little League's motion for summary judgment and judgment on the evidence; and

2. Whether the trial court properly instructed the jury on the doctrine of imputed knowledge.

*Facts and Procedural History*

The facts most favorable to the verdict reveal that the Little League is an organization which provides youths with the opportunity to play supervised and organized baseball against other youths.[1] The Little League was formed and operates under the by-laws and charters of the Little League International. In addition, the Little League is locally operated and managed by a board of directors. The Little League owns real estate which has been converted to baseball fields for Little League games and practice. Furthermore, the Little League is primarily staffed by volunteers from the local community. Adult volunteers typically become involved through community service and their children's involvement and participation in Little League baseball. In 1992, the Little League did not conduct criminal background checks of its adult volunteers.

Kent Simmerman had been a volunteer for the Little League since 1979. Simmerman originally became involved with the Little League during his children's partic-

ipation. Simmerman continued to volunteer for the Little League after his children outgrew their eligibility to play. In the spring of 1992, Simmerman retained the positions of equipment manager,[2] vice-president, board member, and member of the executive committee of the board of directors with the Little League. While acting as an official of the Little League, Simmerman was authorized to wear a cap that said "Southport Little League" and a shirt that said "Southport Little League Official."

As the equipment manager, Simmerman was also in charge of fitting youths with baseball uniforms. Simmerman personally fitted youths with baseball uniforms behind locked doors in an equipment shed owned by the Little League which was located near the baseball field. Typically, Simmerman was the only adult present during these fittings. Because Simmerman was on the executive committee of the board of directors, Simmerman had a key to the equipment shed[3] which housed baseball equipment and uniforms.

J.V., age nine and M.V., age eleven, played Little League baseball. Both of the youths met Simmerman through their participation in Little League baseball, and knew that he was a Little League official. In the spring of 1991, M.V., along with four or five other youths, tried on baseball uniforms in the Little League's equipment shed. Simmerman, who was fitting the

1. The Constitution of the Little League provides that "[t]he objective of the Southport Little Leagues shall be to implant firmly in the children of the community the ideals of good sportsmanship, honesty, loyalty, courage, and the respect for authority, so that they may be well adjusted, stronger and happier children and will grow to be good, decent, healthy and trustworthy citizens." R. 1083(a).

2. There is a dispute between the parties as to whether Simmerman retained the position of equipment manager with the Little League when the molestations occurred. Ed Bullock, president of the Little League from April of 1992 to September of 1993 provided in his affidavit that "Simmerman was a member of the Southport Little League Board in 1992 and held the position of equipment manager and vice president at that time." R. 73. In

addition, Rick Normington, president of the Little League from September of 1993 provided in his affidavit that "Simmerman was member of the Southport Little League Board in 1992 and held the position of equipment manager at that time." R. 59. The Little League states in its Brief in Support of Summary Judgment that Simmerman retained the position of equipment manager in 1992. R. 138. However, Simmerman testified at trial that he never retained the position of equipment manager with the Little League. R. 898. For purposes of this appeal, we have assumed that Simmerman retained the position of equipment manager with the Little League.

3. The equipment shed contained restrooms, a room for storage, a room utilized by the boys and a room utilized by the girls who played Little League baseball. R. 313.

boys with uniforms, pulled down M.V.'s underwear and viewed M.V.'s genitalia as he was helping M.V. take off his pants. On a separate occasion when M.V. was being fitted with a baseball uniform, Simmerman pulled out the waistband M.V.'s baseball pants and his underwear and looked at his genitalia. Also, in the spring of 1992, Simmerman, dressed as a Little League official, approached M.V., who was at the Little League baseball field watching J.V.'s game, and asked M.V. to accompany him to the equipment shed for aid in retrieving some equipment. Simmerman later molested M.V. in the equipment shed.

In the spring of 1992, J.V., along with other youths, tried on baseball uniforms in the Little League's equipment shed. After J.V. put on a pair of baseball pants, Simmerman pulled out the waistband of the pants along with the waistband of J.V.'s underwear and looked at his genitalia. On a separate occasion in the spring of 1992, Simmerman, dressed as a Little League official, approached J.V. who was at the Little League baseball field watching M.V.'s game, and asked J.V. to accompany him to the equipment shed. Simmerman later molested J.V. in the equipment shed.

Consequently, the State charged Simmerman with two counts of child molesting, Class C felonies. Simmerman later entered a plea of guilty.[4] On June 11, 1993, the Vaughans filed a complaint against the Little League for the wrongful acts on the basis of vicarious liability and negligence.[5] The Little League subse-

quently filed with the trial court a motion for summary judgment, which was denied following a hearing. Consequently, the Little League filed a motion to reconsider with the trial court, a motion which was later denied by the trial court.

A jury trial was conducted on the Vaughans' complaint. At the close of the Vaughans' case-in-chief, the Little League moved for judgment on the evidence. The trial court later denied the Little League's motion for judgment on the evidence. The jury returned a verdict in favor of M.V. against the Little League, awarding him $225,000.00 in compensatory damages. The jury also awarded J.V. the sum of $225,000.00 against the Little League. In addition, the jury awarded Steven and Rebecca Vaughan $0.00. On June 17, 1999, the trial court entered the following entry with respect to the damage award:

> judgment is entered in favor of Plaintiffs, Steven and Rebecca Vaughan and against the Defendant, Southport Little League, in the sum of zero dollars ($0.00), and that judgment be entered in favor of Plaintiff, [M.V.] and against the Defendant, Southport Little League, in the sum of Two Hundred Twenty–Five Thousand Dollars ($225,000); and that judgment be entered in favor of Plaintiff, [J.V.] and against the Defendant, Southport Little League, in the sum of Two Hundred Twenty–Five Thousand Dollars ($225,000).

R. 720. Subsequently, the Little League filed a motion to correct errors, a motion which the trial court later denied. This appeal ensued.

---

4. The State also charged Simmerman with five additional counts of child molestation, Class C felonies, for his acts against five other children. R. 250–252. Therefore, the State charged Simmerman with a total of seven counts of child molesting, Class C felonies. *Id.* Simmerman ultimately entered a plea agreement with the State whereby he pleaded guilty to four counts of child molestation, Class C felonies. R. 260–62. The record is unclear as to which counts of child molestation Simmerman pled guilty. However, as part of the plea agreement Simmerman admitted the probable cause affidavit which

contained a brief description of the sexual molestations of M.V. and J.V. by Simmerman. *See* R. 253–54, 262.

5. We note that the board of directors of the Little League did not interview Simmerman, require him to provide references, nor have him complete an application prior to offering him positions of authority with the Little League. R. 895. Prior to the sexual molestations, Simmerman was arrested for indecent exposure in Garfield Park, an area known for homosexual activity. R. 912. Simmerman completed a pre-trial diversion program and the State dismissed the charge. R. 933.

*Discussion and Decision*

## I. Respondeat Superior

■ Respondeat superior is the applicable tort theory of vicarious liability. The doctrine of respondeat superior creates liability for a principal where it otherwise would not exist. *Stump v. Indiana Equip. Co., Inc.*, 601 N.E.2d 398, 403 (Ind.Ct.App. 1992), *trans. denied.* The doctrine has its origin in public policy and justice. *Id.* According to the doctrine of respondeat superior, an employer, who is not liable because of his own acts, can be held liable "for the wrongful acts of his employee[6] which are committed within the scope of employment." *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind.1999). An employee is acting within the scope of his employment when he is acting, at least in part, to further the interests of his employer. *Konkle v. Henson*, 672 N.E.2d 450, 456 (Ind.Ct.App.1996). Liability will attach where an employee acts partially in self-interest but is still "partially serving his employer's interests." *City of Fort Wayne v. Moore*, 706 N.E.2d 604, 607 (Ind. Ct.App.1999), *trans. denied.* However, simply because an act could not have occurred without access to the employer's facilities does not bring it within the scope of employment. *Konkle*, 672 N.E.2d at 457.

■ An employer can be vicariously liable for the criminal acts of an employee. *Gomez v. Adams*, 462 N.E.2d 212, 223 (Ind.Ct.App.1984). The proper test is whether the employee's actions were at least for a time authorized by his employer. *Stropes v. Heritage House Childrens Ctr.*, 547 N.E.2d 244, 250 (Ind.1989). However, if it is determined that none of the employee's acts were authorized, there is no respondeat superior liability. *City of Fort Wayne*, 706 N.E.2d at 607. Furthermore, acts for which an employer is not responsible are those done on the employee's own initiative with no intention to perform it as part of or incident to the service for which he is employed. *Stropes*, 547 N.E.2d at 247. If some of the employee's actions were authorized, the question of whether the unauthorized acts were within the scope of employment is one for the jury. *Konkle*, 672 N.E.2d at 457. However, if none of the employee's acts were authorized, the matter is a question of law. *Id.*

## II. Summary Judgment

The Little League first contends that the trial court erred in denying its motion for summary judgment. We disagree.

---

6. Although not addressed by the parties on appeal, we must address the issue of whether an employment relationship existed between Simmerman and the Little League. We have previously stated that the test for determining the existence of an employer-employee relationship is the right to direct and control that conduct of the alleged employee at the time the wrongful act occurred. *Dague v. Fort Wayne Newspapers, Inc.*, 647 N.E.2d 1138, 1140 (Ind.Ct.App.1995), *trans. denied.* Such control refers only to the right of control not necessarily the exercise of control over the employee. *Id.* The right of control is determined by consideration of the following factors: (1) the right to discharge; (2) mode of payment; (3) supplying tools or equipment; (4) belief by the parties in the existence of an employer-employee relationship; (5) control over the means used in the results reached; (6) length of employment; and (7) establishment of the work boundaries. *Hale v. Kemp*, 579 N.E.2d 63, 67 (Ind.1991) (citing *Fox v. Contract Beverage Packers, Inc.*, 398 N.E.2d 709, 711 (Ind.Ct.App.1980)); Restatement (Second) of Agency § 220 (1958). In order to support a determination that an employer-employee relationship exists between the parties, it is not necessary that all seven factors be present. *Nowicki v. Cannon Steel Erection Co.*, 711 N.E.2d 536, 540 (Ind.Ct.App.1999), *trans. denied.* Instead, if a majority of the factors is present, an employer-employee relationship exists. *Id.* Although Simmerman was a non-paid volunteer, we believe that Simmerman was an "employee" of the Little League. Simmerman was under the direct supervision of the board of directors of the Little League. R. 1083. In addition, the record indicates that the board of directors had the right to discharge Simmerman from his positions with the Little League. *Id.* The board of directors also had control over the means used by Simmerman. *See* R. 898, 899. The record further indicates that both the Little League and Simmerman believed that an employment relationship existed. Therefore, Simmerman was an "employee" for purposes of extending liability to the Little League under the doctrine of respondeat superior.

## A. Standard of Review

 Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Great Lakes Chem. Corp. v. International Surplus Lines Ins. Co.*, 638 N.E.2d 847, 849 (Ind.Ct.App.1994). In reviewing a motion for summary judgment, this court must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *Cloverleaf Apartments, Inc. v. Town of Eaton*, 641 N.E.2d 665, 667 (Ind.Ct.App.1994). A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating the trial court erred. *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). Nevertheless, this court must carefully scrutinize the trial court's decision to ensure that the losing party is not improperly denied his day in court. *Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind.1992). Summary judgment is a lethal weapon and courts must be mindful of its aims and targets and beware of over-kill in its use. *Funk v. Funk*, 563 N.E.2d 127, 129 (Ind.Ct.App. 1990), *trans. denied.*

## B. Genuine Issues of Material Fact Exist

 In Indiana, the party moving for summary judgment has the burden of establishing that no genuine issue of material fact exists. *Jarboe v. Landmark Community Newspapers*, 644 N.E.2d 118, 123 (Ind.1994); *Lenhardt Tool & Die Co. v. Lumpe*, 703 N.E.2d 1079, 1082 (Ind.Ct. App.1998), *trans. denied.* Once the moving party has met this burden with a prima facie showing, the burden shifts to the non-moving party to establish that a genuine issue does in fact exist. *Id.* A fact is material if it facilitates the resolution of any of the issues involved. *State Street Duffy's, Inc. v. Loyd*, 623 N.E.2d 1099, 1100 (Ind.Ct.App.1993); *trans. denied.* Any doubt as to a fact, or an inference to be drawn, is resolved in favor of the non-moving party. *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 562 (Ind. 1992). Therefore, we must examine the record to determine whether a genuine issue of material fact exists and whether the trial court properly applied the law.

After filing a motion for summary judgment on the claim of respondeat superior, the Little League designated materials to support its argument that the "undisputed facts establish that Simmerman was acting outside of the scope of his capacity at the time he allegedly committed the sexual batteries." [7] R. 142. Without providing a synopsis of each item of designated material, we conclude that the evidentiary matter establishes that the Little League did not authorize Simmerman to view the genitalia of M.V. and J.V. for his sexual gratification or sexually molest the two youths. *See* R. 55–56, 295–299. Therefore, we believe that the Little League established at the summary judgment stage that no genuine issue of material fact existed with regard to the Little League's authorization of Simmerman to view the genitalia of M.V. or J.V. for his sexual gratification or to commit the sexual molestations.

In opposition to the Little League's motion for summary judgment, the Vaughans' designated materials to support their argument that "the nature of Simmerman's assaults were sufficiently associated with his authorized duties so as to preclude the entry of summary judgment in favor of [the Little League]." R. 325. Without summarizing each of the Vaughans' designated materials, we conclude that the materials raise the inference that some of

---

7. In support of its motion for summary judgment on the claim of respondeat superior, the Little League designated: (1) portions of the responses of the Vaughans to the Little League's interrogatories; (2) Responses to Request for Production; (3) Affidavits of Ed Bullock and Rick Normington; (4) portions of the depositions of the Vaughans, Gary Cooper, Normington, and Harmon; (3) Brief in Support of the Little League's Motion for Summary Judgment; (4) portions of its responses to the Vaughans' interrogatories; and (5) a copy of Simmerman's charging information and part of the trial court's transcript of his sentencing hearing. R. 55–56.

Simmerman's acts were authorized by the Little League when he viewed J.V. and M.V.'s genitalia for his sexual gratification and when he sexually molested the two youths.[8] *See* R. 268–69, 430–31.

In *Stropes,* a hospital aide sexually assaulted a mentally retarded individual left in the hospital's care. *Stropes,* 547 N.E.2d at 245. Some of the hospital aide's acts were in furtherance of the employer's business, such as bathing the boy and changing his bedding. *Id.* at 250. However, the sexual assault was not authorized by the employer. *Id.* The Indiana Supreme Court held that "the nature of acts were, at the very least, sufficiently associated with the [hospital aide's] duties to escape dismissal on summary judgment." *Id.* We have previously stated that if some of the employee's actions were authorized, the question of whether the unauthorized acts were within the scope of employment is one for the jury. *Konkle,* 672 N.E.2d at 457. However, if none of the employee's acts were authorized, the matter is a question of law. *Id.* Because the Vaughans' designated materials raise the inference that some of Simmerman's acts were authorized (such as fitting the youths' uniforms) when he viewed J.V. and M.V.'s genitalia for his sexual gratification and when he sexually molested the youths, we hold that the trial court properly denied the Little League's motion for summary judgment.

### III. Judgment on the Evidence

The Little League also contends that the trial court erred in denying its motion for judgment on the evidence. We disagree.

### A. Standard of Review

When this court reviews a trial court's ruling on a motion for judgment on the evidence, we apply the same standard as the trial court, considering only the evidence and reasonable inferences most favorable to the nonmoving party. *Young v. Butts,* 685 N.E.2d 147, 149 (Ind.Ct.App. 1997). Judgment on the evidence is appropriate only if there is no substantial evidence or reasonable inferences to be drawn therefrom to support an essential element of the claim. *Id.* Judgment on the evidence should be entered only if the evidence points unerringly to a conclusion not reached by the jury. *Pacific Employer's Ins. Co. v. Austgen's Elec., Inc.,* 661 N.E.2d 1227, 1229 (Ind.Ct.App.1996), *trans. denied.*

### B. Question of Fact for the Jury

Our initial inquiry is to determine whether the question of the scope of Simmerman's employment was one of fact for the jury or was a question of law for the trial court. Therefore, we must examine the factual circumstances of the present case to determine whether at least some of Simmerman's actions were authorized.

Although the parties primarily argued whether or not the Vaughans were entitled to compensation for the sexual molestations of the J.V. and M.V., the Vaughans also presented evidence that Simmerman committed the wrongful acts of viewing J.V. and M.V.'s genitalia for his sexual gratification. Therefore, the present case involves two separate and distinct wrongful acts on the part of Simmerman toward M.V. and J.V. These wrongful acts are: (1) the viewing of J.V. and M.V.'s genitalia for his sexual gratification; and (2) the sexual molestations of J.V. and M.V. Clearly the Little League did not authorize Simmerman to view M.V. and J.V.'s genitalia for his sexual gratification nor did it authorize Simmerman to sexually molest the two youths. However, we believe that some of Simmerman's actions were authorized, at least for a time, by the Little League.

---

8. In opposition to the Little League motion for summary judgment on the claim of respondeat superior, the Vaughans designated: (1) the complaint; (2) Simmerman's amended information, affidavit of probable cause, and a portion of the transcript of his sentencing; (3) Simmerman's answers to the Vaughans' interrogatories; and (4) portions of the deposition of M.V., J.V., Michael Miller, Tom Pelham, Ken Roosa, Normington, and Cooper. R. 269, 430–31.

### 1. Viewing of Genitalia

As the equipment manager, Simmerman was the sole individual in charge of fitting youths with baseball uniforms. R. 899. Simmerman was delegated the duty of distributing baseball uniforms because he approached the President of the Little League and specifically requested that duty. R. 1309. After Simmerman retained the position of equipment manager, he changed the procedure for distributing uniforms to participating youths. R. 1096. The previous equipment manager, Tom Pelham, did not fit the participating youths with uniforms in the equipment shed. *Id.* Pelham distributed uniforms to the team managers who would then give the youths uniforms to try on at home. *Id.* However, Simmerman personally fitted the youths with baseball uniforms in the equipment shed owned by the Little League. R. 900.

Youths in groups of four or five would come into the equipment shed and try on different size uniforms in Simmerman's presence. R. 978. On many occasions, Simmerman would lock the door of the equipment shed from the inside so that other adults could not gain access to the premises during the fitting of uniforms. R. 978, 1310. Moreover, Simmerman typically was the only adult in the equipment shed when youths were being fitted for uniforms. R. 978. The Little League was aware of the procedure Simmerman utilized in fitting youths with baseball uniforms. R. 1075–76, 1301–03, 1310. Thus, Simmerman was clearly authorized by the Little League to be the only adult fitting youths with uniforms behind the locked doors of the equipment shed.

During the fitting of uniforms, youths inadvertently would be in different stages of undress as they tried on different uniforms and Simmerman was clearly authorized to assist the youths in dressing and undressing. Furthermore, Simmerman was authorized to measure the youths to ensure that the right size was distributed to a youth. In addition, the Little League authorized Simmerman to obtain information from the youths so that each boy received the jersey for the team he was playing on. Because we have determined that some of Simmerman's acts were authorized by the Little League, we believe that it was within the province of the jury to determine whether the Little League was liable under the doctrine of respondeat superior for Simmerman's acts of viewing the genitalia of M.V. and J.V for his sexual gratification.

### 2. Sexual Molestations

The acts of molestation by Simmerman occurred in the equipment shed of the Little League during a Little League-sponsored baseball game. R. 950–51. The equipment shed was not open to the general public and was typically locked when not in use. R. 900. Only members of the executive committee of the board of directors of the Little League, of which Simmerman was a member, were given master keys to the property owned by the Little League, such as the equipment shed R. 898. Thus, Simmerman was authorized by the Little League to use the equipment shed.

Furthermore, Simmerman was a long-time volunteer with the Little League. R. 894–95. At the time that Simmerman committed the wrongful acts of viewing the youth's genitalia and sexually molesting them, Simmerman occupied high positions of authority in the Little League as vice-president, member of the board of directors, and member of the executive committee of the board of directors. R. 897. During Little League baseball games and other events, Simmerman typically wore a baseball cap with the caption "Southport Little League" and a shirt with the caption "Southport Little League Official." R. 904. Youths who participated in Little League baseball were taught to respect adult authority, and it was clear to participating youths that Simmerman held a position of authority with the Little League. *See* R. 903, 908, 979. When an individual is clothed with authority by an organiza-

tion in which youths are participating, such as Little League baseball, youths will typically comply with requests or commands of the adult individual in authority. Thus, the Little League, by appointing Simmerman an official, essentially authorized Simmerman to exert his authority over youths who participated in Little League baseball.

It is clear that Simmerman's position with the Little League gave him the means to lure M.V. and J.V. into the equipment shed so that he could commit the sexual molestations. Because of his position as an official and equipment manager with the Little League, Simmerman was able to persuade the two youths to accompany him to the equipment shed for the pretextual reason of retrieving equipment. M.V. and J.V. accompanied Simmerman because it was logical for the youths to assume that Simmerman, as the equipment manager, would need to retrieve equipment because a baseball game was in progress. In fact, M.V. stated that he was able to get away from Simmerman while he was being molested because a coach knocked on the door of the equipment shed and asked for some baseballs. R. 980. Moreover, Simmerman, as a Little League official and equipment manager, was authorized by the Little League to be at the baseball field during games and practices. Because some of Simmerman's acts were authorized, we believe that the determination of whether the Little League was liable under the doctrine of respondeat superior for the sexual molestations was a question of fact for the jury.

C. Substantial Evidence and Reasonable Inferences Supports the Jury's Verdicts

■ Because we have determined that the question of whether the Little League was liable under the doctrine of respondeat superior for the wrongful acts committed by Simmerman was a question of fact for the jury, we must now determine whether substantial evidence and reasonable inferences support the jury's verdicts.

After reviewing the record, we believe that the jury's verdicts are supported by substantial evidence and reasonable inferences. M.V. testified by deposition that on one occasion when he was trying on uniforms in the equipment shed, Simmerman pulled down his underwear and viewed his genitalia as Simmerman was assisting him in taking off a pair of baseball pants. R. 168. Simmerman admitted pulling down M.V.'s underwear when he was helping M.V. take off his pants. R. 951. Furthermore, M.V. testified at trial that after Simmerman came into the equipment shed and told him and other youths to take their clothes off and put uniforms on, Simmerman pulled out the waistband of his baseball pants and his underwear and looked at his genitalia. R. 978. J.V. testified in his deposition that on several occasions when Simmerman was fitting him with baseball pants, Simmerman looked at his genitalia. R. 188.

Furthermore, M.V. testified by deposition and at trial that in the spring of 1992, he was watching J.V.'s baseball game when Simmerman approached him, dressed as a Little League official, and asked him to accompany Simmerman to the equipment shed to retrieve some equipment. R. 171, 978. M.V. further testified that Simmerman molested him in the equipment shed. R. 171–73, 978–79. In addition, J.V. testified by deposition and at trial that in the spring of 1992, he was watching M.V.'s baseball game when Simmerman approached him, dressed as a Little League official, and asked him to accompany Simmerman to the equipment shed. R. 190–92, 1231. Simmerman admitted sexually molesting M.V. and J.V. in the equipment room. R. 950–951.

The fact that this case involves the viewing of youth's genitalia for personal gratification and sexual molestations is not per se determinative of the scope of the employment question. *See Stropes,* 547 N.E.2d at 249. The Indiana Supreme Court has stated that "[a] blanket rule holding all sexual attacks outside the scope of employment as a matter of law because they satisfy the perpetrators' personal desires would draw an unprincipled distinction between such assaults and other types

of crimes which employees may commit in response to other motivations, such as anger or financial pressure." *Id.* The scope of employment question "does not turn on the type of act committed or on the perpetrator's emotional baggage accompanying the attack." *Id.* Instead, the appropriate focus must be on how the employment relates to the context in which the wrongful act arose. *Id.*

After reviewing the evidence presented at trial, we cannot say that Simmerman's acts of viewing J.V. and M.V.'s genitalia for his sexual gratification and the sexual molestations were so divorced in time, place, and purpose from his employment that the Little League was entitled to judgment on the evidence. Therefore, we hold that substantial evidence and reasonable inferences supports the jury's verdicts in favor of the Vaughans.

### IV. Jury Instruction

The Little League also contends that the trial court erred in tendering the imputed knowledge instruction to the jury. We disagree.

### A. Standard of Review

The Little League is entitled to have the jury correctly instructed on an essential rule of law. *See Carson v. State,* 686 N.E.2d 864, 865 (Ind.Ct.App.1997), *trans. denied.* Jury instructions are within the discretion of the trial court and will only be reversed on a showing of abuse of that discretion. *Young v. State,* 696 N.E.2d 386, 389 (Ind.1998). The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Fox v. State,* 497 N.E.2d 221, 225 (Ind.1986). Where the verdict would not have differed had the jury been properly instructed, any error in the giving of instructions is harmless. *Canfield v. Sandock,* 563 N.E.2d 1279, 1282–1283 (Ind.1990).

### B. Waiver

The Vaughans argue that the Little League has waived any error in the instruction for our review. To preserve erroneous jury instructions for appeal, the Little League was only required to make a timely objection to the instruction at trial; it was not required to tender its own corrective instructions, contrary to the Vaughans' assertion. *See Carson v. State,* 686 N.E.2d at 865. Indiana Trial Rule 51(C) states that "[n]o party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The purpose of this trial rule is to protect the trial court from inadvertent error. *Terre Haute Reg'l Hosp., Inc. v. El–Issa,* 470 N.E.2d 1371, 1376 (Ind.Ct.App.1984), *trans. denied.* Thus, the objection to the instruction must be sufficiently specific to make the trial judge aware of the alleged error before he reads the instruction to the jury. *Id.*

Objections to instructions must state why the instruction is misleading, confusing, incomplete, irrelevant, not supported by the evidence, or an incorrect statement of the law. *See Carrier Agency, Inc. v. Top Quality Bldg. Prods., Inc.,* 519 N.E.2d 739, 744 (Ind.Ct.App.1988), *trans. denied.* An objection which is not specific preserves no error on appeal. *Johnson v. Naugle,* 557 N.E.2d 1339, 1341 (Ind.Ct. App.1990). In other words, failure to comply with the requirements of Trial Rule 51(C) results in the waiver of any error in the giving of the instruction. *Terre Haute Reg'l Hosp., Inc.,* 470 N.E.2d at 1376. In addition, a party claiming error in the giving of an instruction is limited to his stated objection at trial. *Weller v. Mack Trucks, Inc.,* 570 N.E.2d 1341, 1343 (Ind. Ct.App.1991).

In the present case, the Vaughans submitted to the trial court Proposed Final Instruction number 6, which provides that:

> Knowledge of any agent or employee of Southport Little League is knowledge of Southport Little League itself, regardless of whether the agent or employee shared his knowledge with anyone else.

The Southport Little League is charged with the knowledge of that which its agents and employees by ordinary care could have known where the agent has received sufficient information to awaken inquiry.

R. 482. The Little League submitted a written objection to the Vaughan's Proposed Final Instruction number 6 on the basis that the instruction was overly broad, arguing that the "instruction attempts to impute the knowledge of any employee to his principal." R. 590. Subsequently, the trial court tendered Final Instruction number 32 to the jury, which provides that:

Knowledge of any agent or employee of Southport Little League during the course of his employment and within the scope of his authority is knowledge of Southport Little League itself, regardless of whether the agent or employee shared his knowledge with anyone else. The Southport Little League is charged with the knowledge of that which its agents and employees by ordinary care should have known where the agent has received sufficient information to awaken inquiry.

R. 752. Thereafter, the Little League orally objected to Final Instruction number 32 on the basis that "it would be confusing to the jury in that they could find that the knowledge of Simmerman could be imputed or constructed knowledge on behalf of [the Little League]" and that "an intentional or criminal act cannot be imputed through constructive knowledge or otherwise to the entity for which the agent might have been employed or volunteered." [9] R. 1446. The Little League also objected to Final Instruction number 32 on the basis that "there is no evidence that an agent or employee within the course of his employment or within the scope of his authority had knowledge regarding Simmerman's alleged acts or admitted acts of molestation and therefore the instruction was not supported by evidence in this case." *Id.* Because the Little League timely objected to the giving of

Final Instruction number 32, and provided a basis for the objection, we hold that the Little League properly preserved the error for appeal.

### C. Imputed Knowledge Instruction

Because we have determined that the Little League preserved the error for our review, we must now examine the imputed knowledge instruction tendered to the jury. We note initially that "[i]mputed knowledge is a tenet of agency law, and is based upon an underlying legal fiction of agency-the identity of principal and agent when the agent is engaged in the principal's business." *Stump*, 601 N.E.2d at 403. "Under this rule, the law imputes the agent's knowledge to the principal, even if the principal does not actually know what the agent knows." *Id.* The doctrine of imputed knowledge came about as a means of extending liability. *Id.*

The Restatement (Second) of Agency has addressed the doctrine of imputed knowledge, providing in pertinent part that:

a. A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes, except as stated in Subsection 2.

b. The principal is affected by the knowledge of an agent who acts adversely to the principal:

(a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;

Restatement (Second) of Agency § 282 (1957). Essentially, the doctrine of imputed knowledge "is a rule of public policy based upon the precept that when a principal acts through an agent, a third party dealing with agent is entitled to rely upon the agent's knowledge, which binds the principal." *Stump*, 601 N.E.2d at 403.

---

9. We note that the trial court and the parties agreed to put objections to the trial court's final instructions on the record after the jury retired for deliberations. R. 1423.

The rule of imputed knowledge is typically applied so that the risks of an agent's infidelity or lack of diligence falls upon one who delegates authority to that agent, rather than upon innocent third parties. *Id.*

This court has long recognized that a principal is charged with the knowledge of that which his agent by ordinary care could have known where the agent has received sufficient information to awaken inquiry. *Travelers Ins. Co. v. Eviston*, 110 Ind.App. 143, 37 N.E.2d 310, 316 (1941). We have previously held that knowledge of material facts acquired by an agent in the course of his employment, and within the scope of his authority, is the knowledge of the principal, and where no actual knowledge of the principal is shown, the rule will be given the effect on the theory of constructive knowledge, resting on the legal principle that it is the duty of the agent to disclose to his principal all material facts coming to his knowledge, and upon the presumption that he has discharged that duty. *National Mut. Ins. Co. of Celina, Ohio v. Bales*, 81 Ind.App. 302, 139 N.E. 703 (1923). The Indiana Supreme Court has stated that:

> Notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of his agency; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal; and, if he has not, still, the principal having entrusted the agent with the particular business, the other party has the right to deem his acts and knowledge obligatory upon the principal.

*Field v. Campbell*, 164 Ind. 389, 72 N.E. 260, 263 (1904).

In the present case, the Little League objected to the trial court tendering the imputed knowledge instruction to the jury without a limiting instruction accompanying it specifically advising the jury that the knowledge of Simmerman could not be imputed to the Little League.[10] R. 1447. This court has recently stated that when an agent commits an independent tort for his own benefit, but still in the scope of employment, some knowledge or reason to know of the agent's conduct is required before liability attaches to the principal. *Midcontinent Paper Converters, Inc. v. Brady, Ware, & Schoenfeld Inc.*, 715 N.E.2d 906, 910 (Ind.Ct.App. 1999); *see also Indiana Bell Telephone v. Maynard*, 705 N.E.2d 513, 514–15 (Ind.Ct. App.1999), *trans. denied.*

We believe that the trial court properly instructed the jury on imputed knowledge. The Vaughan's presented substantial evidence at trial that employees and agents of the Little League gained knowledge about Simmerman, a Little League official, which should have raised a "red flag" to the Little League that Simmerman was or was capable of committing the wrongful acts. Specifically, the Little League's groundskeeper testified that he observed Simmerman inappropriately hugging a child to whom he was not related near the concession stand located on Little League property. R. 990. In addition, a former president of the Little League, Richard Booher, testified at trial that he had received complaints from mothers of youths playing Little League baseball that they knew what size pants their boys wore and did not believe that Simmerman needed to personally fit their child with baseball pants. R. 1311. Moreover, Ken Roosa, a member of the Little League organization, testified that he observed Simmerman on

**10.** Although the trial court denied the Little League's request for a limiting instruction, it did instruct the Vaughans that they were prohibited from arguing during closing arguments that the jury could impute the knowledge of Simmerman's own activities to the Little League. R. 1423. Thus, during closing arguments, the Vaughan's argued that the knowledge of Little League employees and agents, excluding Simmerman, gave the Little League constructive knowledge of Simmerman's propensity to commit the wrongful acts against the youths.

several occasions cruising and sitting in a parked car in Garfield Park, an area known for its homosexual activity and that he also observed Simmerman spending an unusual amount of time with a youth not related to him. R. 1126–27. In addition, Ed Bullock, a former president of the Little League, testified at trial that the Little League received information on programs from the district office of the Little League on how to protect youths from child molesters, but no action was taken by the Little League. R. 1350–51.

### Conclusion

Based on the foregoing, we hold that the trial court properly denied the Little League's summary judgment motion and motion for judgment on the evidence. In addition, we hold that the trial court properly instructed the jury on imputed knowledge. Accordingly, the jury verdict is affirmed.

Affirmed.

SHARPNACK, C.J., and BARNES, J., concur.